McDougald, adm'x, &c. *vs.* Bellamy, adm'r, &c.

No. 55.—ANN E. McDOUGALD, adm'x, &c. plaintiff in error, *vs.* S. A. BELLAMY, adm'r of S.    BAILEY, defendant in error.

[1.] It is not error in the Court to refuse to give    rge, which is founded upon a misapprehension of the testimony.

[2.] All who were at any time stockholders in the Planter's & Mechanic's Bank of Columbus, are liable to the bill-holders, unless they have transferred their stock six months before the failure of the bank, and given notice thereof, in some public Gazette of this State.

[3.] A stockholder ceases to be such, *inside of the charter,* so far as his rights and obligations are concerned, as a member of the corporation, from the date of his transfer of stock, whether notice is given thereof or not.

[4.] Can a stockholder, who has transferred his stock, but failed to give the notice required by the charter, and whose proportionate liability for the redemption of the outstanding circulation is equal to the bills which he holds, maintain an action under the 11th section of the charter, against another stockholder? Or if the amount of bills which he holds exceeds his liability, can he sue for such excess? *Quere.*

[5.] The stock of the Planter's & Mechanic's Bank of Columbus consisted of $1.000.000; and the charter required that $250.000 in specie, be paid before the board of directors should be permitted to issue bills. The president and directors, in 1837, organized and notified the Governor that the foregoing provision of the charter had been "literally and strictly complied with;" when, in fact, the twenty-five per cent. had not been paid, which was known to the board. The president subsequently transferred his stock, before any bills were issued. In 1838, a large amount of notes were put in circulation: *Held,* that an action cannot be maintained, by the ad-

ministrator of the president, to recover of a stockholder the amount of bills which he held at his death, under the 11th section of the charter, he having participated in the previous illegal proceedings, which were necessary to the making of said issue in 1838.

[6.] No one shall derive a benefit from the violation of the law, or from a fraud practiced by himself or others, to his own advantage.

[7.] Conceding that the Planter's & Mechanic's Bank of Columbus was organized and bills issued, without the actual payment of the $250.000 in specie, required by the charter; and that by reason thereof, the State might, at any time, have recalled its corporate franchises; or a stockholder have resisted the payment of stock; or a debtor his liability to the bank, provided the rights of third persons were not prejudiced: *Held*, that it was, nevertheless, a valid corporation, so as to make it liable to creditors for its own acts; and its stockholders liable to bill-holders, under the charter, for the ultimate redemption of the bills put in circulation by the bank.

[8.] Corporations are liable for the frauds and torts of their agents, done in the course of their employment, in the same manner as individuals are responsible for the acts of ⬤ servants, touching their business; the tendency of the law is, to p⬤ corporations and individuals upon the same footing.

[9.] The doctrine, th⬤ corporation can only, through its agents, do *right*, and is not responsib⬤ r its *wrongs*, is exploded. The principal warrants the fidelity of his agent, in all matters relating to his agency.

[10.] The board of directors have authority to bind the bank, while acting within the scope of the general usage, practice and course of business of such institutions, so far as third persons are concerned, who have no knowledge to the contrary.

[11.] Where one of two innocent persons is to suffer from the tortious act of a third, he who gave the aggressor the means of doing the wrong, must alone bear the consequences of the act.

[12.] Notwithstanding a bank may have organized contrary to law, still, it is competent for the Legislature to pass a Statute of pardon, waiving the wrong; and in such case, the omission or abuse of authority cannot be set up as a defence by the defaulting corporation; nor relied upon as absolving it from the performance of its obligations.

[13.] The directors are the agents of the corporation, and not of the stockholders; yet, if they stipulate for the ultimate redemption of the bills issued by the bank, if the bank be bound by the acts of the agent, the stockholders are liable upon their special agreement.

Debt, &c. in Muscogee Superior Court. Tried before Judge WORRELL, December adjourned Term, 1854.

This suit was commenced by Samuel A. Bailey, as the holder

of bills of the Planter's & Mechanic's Bank of Columbus, against the adm'x of Daniel McDougald, one of the stockholders in said bank, to compel from him the ultimate redemption of said bills.

It appeared, on the trial, that Samuel A. Bailey was one of the original stockholders in the Planter's & Mechanic's Bank, holding a large number of shares. That he was the first president of the board of directors thereof, and consequently aided in its organization. As president, on the 9th May, 1837, he directed the following letter to Governor Schley, then in the Executive chair :

" Sir : The 4th section of the Act of the General Assembly, passed at its late session, entitled " an Act to incorporate a Banking Company under the name and style of the Planter's & Mechanic's Bank of Columbus," requires the officers of this bank, before issuing any of their bills, to report to your Excellency, that the provisions of the charter have been strictly and literally complied with. The sum of two hundred and fifty thousand dollars, in specie, having been collected by and paid over to us, by a committee of the stockholders, and the same being now at our control in the Bank of Columbus, being there deposited for safe-keeping, we, in obedience to the 4th section of said charter, hereby report to your Excellency, that the provisions of said charter have been strictly and literally complied with.

Very Resp'ly, &c.
(Signed)        S. ARMSTRONG BAILEY, Pres't.
                S. H. PECK, Cash'r.

Accompanying this letter was the annexed affidavit :

GEORGIA, MUSCOGEE COUNTY :

Personally came before me Samuel A. Bailey, Pres't, Samuel H. Peck, Cash'r, and H. G. Smith, Hines Holt, Jr. A. B. Ragan, F. C. McKinley and S. R. Bonner, directors of

the "Planter's & Mechanic's Bank of Columbus," who, being duly sworn, say that the facts stated above are true.

(Signed)          S. ARMSTRONG BAILEY, Pres't,
S. H. PECK, Cash'r,
H. S. SMITH,
A. B. RAGAN,            } *Directors.*
F. C. McKINLEY,
S. R. BONNER,

Sworn to and subscribed before me this 9th May, 1837.
GEORGE CHATFIELD, J. P.

MATTHEW ROBISON testified : The bank commenced its operations as a suspended bank ; never was able to pay its debts in specie in any one day, if they had all been presented together. Bailey owned, at one time, 1575 shares of the bank ; transferred them, at various times, up to 5th February, 1838. On 1st February, 1838, a new president and board of directors were elected ; knows of no specie being paid in by the stockholders. On the 5th February, 1838, there was very little specie in the bank—somewhere between $5 and $1.000. On 26th May, 1843, there were in circulation, of the bills, $229.000. $20.000 were hypothecated with John L. Mustian, as security for money loaned.

A. B. RAGAN testified : He was cashier in 1837 ; H. S. Smith was first president, for a few weeks, and succeeded by Bailey. After the stock was taken, and before the officers were elected, a committee was appointed, (of which Bailey was one,) to whom the stockholders paid 25 per cent. on the stock, partly in bank bills, partly in checks on other banks, and partly in stock notes—only one stockholder paid in specie. The committee made an arrangement with the Bank of Columbus for a specie certificate of deposit of $230.000, and with the Insurance Bank for a like certificate for $20.000, for which the committee turned over to these banks the stock, notes, checks, &c. as aforesaid. Specie was then worth a premium of 5 per cent. ; no premium was paid to these banks. The election for officers then took place. These certificates were held by the directors, for a week or two, and were then

returned to the Bank of Columbus; and in lieu thereof, a credit of $250.000 was placed on the books of that bank, to the Planter's & Mechanic's Bank. Some time afterwards it was agreed to loan out the capital stock, except about 2 per cent. retained for expenses, giving the stockholders the preference, and taking their notes, and giving a check on the Bank of Columbus. Before reporting the organization to the Governor, the directors went to the Bank of Columbus, and were told by Davis, the cashier, that the P. & M. Bank had $230.000 in specie, subject to their control, and some kegs and boxes were shown us, purporting to contain specie. Davis said he had made arrangements with the Insurance Bank for us for $20.000; the directors did not call there. After the new board of directors were elected, one half the stock was called in, and was paid in bills of other suspended banks, $7 or $800 in specie. On 5th February, 1838, $52.000, in bills, were issued; and shortly afterwards, others, to the amount of $250.000. The plates had been procured, and the bills struck off previously, during the first year; no bills issued before that time. Bailey ceased, then, to be a director or stockholder.

A. H. COOPER testified: That the bills now sued on originally belonged to Miller, Ripley & Co.; that Hill, Dawson & Co. received them as agents for Miller, Ripley & Co. They repudiated the act, and tried to hold their agents responsible for the debt. They failed. Gen'l Bailey, as their Counsel, took these bills (five thousand dollars and upwards) for his services in the case. The services were worth about $500.

JOHN BANKS testified: That after the specie certificates were delivered to the committee, he called on Mr. Roberts, the cashier of the Insurance Bank, and learned that the specie would not be paid over to the directors, on the certificate; and that therefore, he refused, as a director, to participate farther in the organization.

Other witnesses were sworn, corroborating these.

There was also in evidence the record of the forfeiture of the charter of the Planter's & Mechanic's Bank, on the

ground stated in the information, of its failure to pay specie when demanded for the bills of the said bank.

Counsel for A. E. McDougald, adm'x, &c. requested the Court to charge the Jury as follows :

1st. That if the Jury should believe, from the evidence, that plaintiff's intestate was a stockholder in said bank, owning 1675 shares of stock therein, and that the bills sued on do not exceed his proportionate share of the circulation, and that said Bailey voluntarily redeemed said bills after the failure of said bank, then such bills, so redeemed, cannot be made the foundation of an action against this defendant, under the 11th section of the charter of said bank, and the Jury must find for the defendant.

2d. That if said Bailey was ever a stockholder in said bank, he continued to be such stockholder, as to his liability under said 11th section of said charter, until it is proved by plaintiff that he transferred his stock, and gave sixty days notice of the fact in some public Gazette of this State.

3d. If the Jury shall believe, from the evidence, that in 1837, said bank was illegally organized; that the $250.000 was not, in fact, paid in specie by the stockholders, and that said Bailey, as president, director or stockholder, participated in such illegal organization, then plaintiff cannot maintain this action, and the Jury must find for the defendant.

4th. If the Jury shall believe, from the evidence, that the directors of said bank, in February, 1838, issued and circulated the bills of said bank, without calling in said capital stock, in specie, then such issue was illegal and void; and if said Bailey transferred his stock to said Smith or others, with a knowledge of such intended issue, without a specie basis, and to enable the directors of said bank to make such issue, these plaintiffs cannot maintain this action, and the Jury must find for the defendant. Each and all of which said charges, said Court then and there refused to give; and to which refusal of said Court to give said charges, the defendant then and there, by her Counsel, excepted.

5th. That though no bills may have been issued during the

year 1837, or whilst said Bailey was a stockholder, yet, if said Bailey were a stockholder at any time, and has not been discharged according to the provisions of the charter or other legal ways, said Bailey is liable, under the 11th section of said charter, for the ultimate redemption of the bills subsequently issued.

6th. That if the Jury shall believe, from the evidence, that any persons holding themselves out as directors, president or cashier of said bank, issued the bills or bank notes sued on and mentioned in plaintiff's declaration, before the sum of two hundred and fifty thousand dollars, in specie, had, in fact and in good faith, been paid in, that these said bills or bank notes were and have been issued against the express inhibition contained in said fourth section of the charter of said bank; and that being thus issued contrary to law, said bills or bank notes are utterly null and void, and that no civil liability can or has arisen thereon, in favor of the plaintiffs against this defendant's intestate; and therefore, the plaintiff cannot recover.

7th. That if the Jury believe, from the testimony, that the original subscribers organized the bank by the election of directors, and that the directors issued and put the bills of the bank in circulation before they had actually paid $250.000 in specie, that said election was void, and they had no authority to issue any bills or do any act as directors; and said bills and all other acts done by them are void, and not binding by law on any one, and defendant is not liable.

8th. That if the Jury believe, from the testimony, that Samuel A. Bailey participated and aided in the arrangements to procure the *specie* certificates, instead of having the specie paid in, as required by the charter, and thereby aided in practising a fraud on the law and on the community, that the plaintiff cannot recover on any of the bills issued by the bank in carrying out the fraud.

9th. That if the Jury shall believe, from the evidence, that two hundred and fifty thousand dollars, in specie, was not, by

the original subscribers, and the persons named in the char-
ter, actually and in good faith paid in, but that in the stead
thereof, the aforesaid subscibers and persons, by a shift, a de-
vice, a scheme, a manœuvre, used paper, termed specie cer-
tificates of deposit, made by the Bank of Columbus and the
Insurance Bank of Columbus, without ever having deposited
in said bank, in specie, the amounts mentioned and specified
in said specie certificates of deposit, that then there was and
could not be any stock in said Planter's & Mechanic's Bank
of Columbus; and that the effort to substitute said certificates
of deposit, and the actual substitution of said certificates of
deposit, in the place and stead of $250.000 in specie, was
and is a fraud upon the law, and contrary to law; and that
the act of issuing said bills or bank notes, and the contract
by said bank, and by this defendant's intestate, to be liable
for their ultimate redemption, is, are and were null and void;
and therefore, the plaintiff has no right to recover.

The Court refused to give either of the charges requested,
and error has been assigned upon this refusal.

There were other requests and refusals by the Court, but
the assignment of errors was confined to those specified above.

Judge BENNING, having been of Counsel, did not preside
in this case.

S. JONES, H. COBB and H. HOLT, for plaintiff in error.

W. DOUHERTY, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] Was the plaintiff entitled to the charge contained in
his first request? We think not; and for this obvious rea-
son: It assumes that the bills upon which the suit was
brought, were " voluntarily redeemed" by Bailey, the defend-
ant's intestate, as a stockholder, after the failure of the
bank; when the evidence of Mr. Cooper, which is uncontra-
dicted, shows that General Bailey took the bills from his

·clients, Miller, Ripley & Co. in the due course of business; that is, as a fee for his professional services, for prosecuting a suit at their instance, against the firm of Hill, Dawson & Co. ·of the City of Columbus. ·

[2.] The proposition embraced in the second request, is a correct exposition of the stockholder liability, under the ˙11th section of the charter of the bank.   For it is certainly ·true, that if S. A. Bailey was, at any time, a stockholder, and had not been discharged according to law, his liability as a stockholder to the bill-holder, still continued.

[3.] This doctrine must be taken, however, with its appropriate qualification.   For if he had transferred his stock from that time, he ceased to be a stockholder *inside* of *the charter*, so far as his rights and obligations, as a member of the corporation, were concerned.

[4.] Back of these propositions, lie questions of immense magnitude and practical importance.   As for instance, as-·suming that General Bailey once owned 1675 shares of stock, all of which he had transferred in his life-time, but had failed to give the sixty days' notice thereof, in some public gazette of the State, as required by the Statute; if his proportion-ate liability to redeem the out-standing circulation of the bank,· equalled or exceeded the whole amount of stock so owned and transferred, could his legal representative maintain an action for the recovery of these bills ?

My first impressions were, that the retired stockholder might sue.   I analogized it to a case of co-partnership; and supposing that the retired partner, who had paid a firm debt, might sue the firm for re-imbursement, and that, too, notwith-standing his continuing liability to third persons.   I applied the same rule to these stockholders.   But the principle, as to *partners*, is not true.   One partner cannot sue another for the re-payment of a past debt of the old firm which he has discharged, and for which he was jointly liable, there be-ing no partnership effects.   (5 *B. & Ad.* 936.   *Story on Con-tracts*, 34, *n. j.*)   In other words, the firm being insolvent, his right to recover must be founded upon some special con-

tract, and does not result from the general law of partner-ships. (5 *M. & Gran.* 759.)

It is true, the charter gives an action against the stock-holders, *severally;* thus departing from the Common Law rule as to partners. But I do not see that this alters the prin-ciple. It is still the case of one partner suing another, for a debt due from all.

Whatever liability the stockholders are under, must be de-duced from the charter. That makes Bailey liable, whether he has transferred his stock or not, provided he has failed to give notice. Is there any agreement, express or implied, that if he has transferred, but failed to give notice, and is com-pelled to redeem a portion of the circulation, the corporate assets being exhausted, that he may go over upon the other stockholders for contribution? None, we apprehend. Is not his only remedy, then, against his assignee, if against any body? Is not the rule inflexible, that one cannot sue another for the payment of a debt, or the performance of an obliga-tion, for which he is equally bound?

Again, if A, B & C, being co-partners, dissolve, and A retires from the firm, still, he will not thereby exonerate him-self from the debt of E, who had previously dealt with the firm, and who had notice of A's retirement. But suppose A were to pay, voluntarily or by compulsion, (which only means a fixed and positive obligation to pay,) this new debt; might he not recover the amount so paid from the firm? And if so, it may be, that were it practicable for the administrator of General Bailey to show that the bills, for the redemption of which the stockholders are liable, were issued subsequent to Bailey's transfer of his stock, would be entitled to sue on the bills held by the estate, under the 11th section of the charter, or individual liability clause.

Before dismissing this branch of the case, I will advert to another topic, germain to the last. Conceding that Billing, as the administrator of Bailey, could not sue on bills up to the amount of his intestate's rateable liability, is he not entitled to maintain an action for the excess over this sum?

McDougald, adm'x, &c. vs. Bellamy, adm'r, &c.

It is settled, that the personal liability of the stockholders, under the charter, is at an end when they have paid or been ·charged with debts to the amount of their *pro rata* share; that they are bound to pay this sum but once; and that whenever they pay this amount voluntarily or by coercion, ·after having paid it, they may set up this payment as a defence against any further liability.

Now notwithstanding the personal liability of the stockholder for his aliquot part of the outstanding circulation, is there any reason why he should not become a creditor of the other stockholders, for the excess of bills over his proportionate responsibility for contribution?

It is said, that if you allow one stockholder to sue another, that so soon as the defendant has paid the debt, he will then stand as a creditor of the company, and may turn round and recover the same money from the plaintiff; and that thus, the parties might sue each other alternately, to the end of the chapter. But does this preposterous result hold good in relation to the excess which the stockholder has paid over and above his proportionate liability? Does the *reductio ad absurdum* argument apply to him?

We forbear to commit ourselves upon these points. They are, perhaps, legitimately included in both the first and se- ·cond requests, especially the first. But as we do not find it absolutely necessary to decide them, we prefer their postponement for further discussion.

[5.] The question made by the 4th, 5th, 7th, 15th and 19th requests to charge, (the 8th not being found in the re- ·cord, and omitted, probably, by the Clerk, in copying the bill of exceptions, but relating, no doubt, to the same subject,) is whether the participation of General Bailey, in the organization of the Bank, was such as to prevent his administrator from recovering upon the bills of which his intestate died possessed?

The capital stock of the Planter's & Mechanic's Bank of Columbus, was one million of dollars. By the second section of the charter, twenty-five per cent. viz: $250.000, was

required to be paid in specie, before any bills could issue. And by the 4th section of the charter, seven directors were to be elected, as soon as the sum of $250.000, in specie, was paid in by the stockholders. And the president, directors and cashier were expressly inhibited from issuing bills until they had, officially and under oath, notified the Governor that the provisions of the charter had been "literally and strictly" complied with. (*Prince,* 125.)

The Act of incorporation was assented to 30th December, 1836. The latter part of April or first of May, 1837, the stockholders met and the stock was all subscribed for, each taking 188 shares of stock. Instead of paying the $250.000 in specie, some six or seven hundred dollars, only, was thus paid, and the balance of the 25 per cent. was paid, partly in bank bills, partly in checks on the Bank of Columbus, and partly in the notes of the stockholders themselves, having some short time to run. A committee was then appointed by the stockholders, (Hampton S. Smith and S. A. Bailey being two of that committee,) to whom these assets, such as they were, were confided, who made an arrangement with the Bank of Columbus, or rather, with H. B. Davis, the cashier, to give specie certificates for the $250.000—$230.000 of which was on the Bank of Columbus, and $20.000 on the Insurance Bank of Columbus. The committee turned over to the Bank of Columbus the bills, checks and promissory notes paid in by the stockholders. No premium was paid the Bank of Columbus for these specie certificates, although specie, at that time, was worth from two to five per cent. premium. An election was then held for officers, and Smith was chosen president, and Samuel H. Peck, cashier. The certificates were held by the directors for a week or two, when they were returned to the Bank of Columbus, and in lieu thereof, a credit to that amount, in favor of the Planter's & Mechanic's Bank, was entered on the books of the Bank of Columbus. In the month of May Smith resigned, and Samuel Armstrong Bailey was elected in his place.

The president and directors, or some of them, went to the

Bank of Columbus, and made inquiry of Mr. Davis, the cashier, about the specie, who replied, that the specie in the kegs and boxes shown to them was subject to their order, and would be paid on demand. And treating Mr. Davis " with a generous confidence," no money was counted. Indeed, none of the kegs and boxes were opened, and perhaps all were not even seen. No one, certainly, knew whether they contained one dollar; they did not go to the Insurance Bank at all, or see even the kegs and boxes in that bank, or have any assurance from the cashier, that the amount of his certificate was subject to their order, and would be paid on demand, in specie.

It appears, from the testimony of John Banks, that he was one of the committee to whom the specie certificates were delivered, in order to put the bank in operation; that he called upon Mr. Roberts, the cashier of the Insurance Bank, and learned that the specie would not be paid or delivered to the directors on the specie certificate which that bank had given; and the witness states, that in consequence of this, he refused to unite with the other directors in the further proceedings which were had to organize the bank.

The president, General Bailey, then addressed a communication to Governor Schley, dated the 9th of May, 1837, in which he stated, that the provisions of the charter had been "literally and strictly complied with;" that "the sum of $250.000 *in specie*, had been *collected by* and *paid over to us* (the directors) by a committee of the stockholders, and that the same was then at their control at the Bank of Columbus, being deposited there for safe-keeping." And this was sworn to by the president, cashier Peck, and four of the directors, to-wit: Hampton S. Smith, A. B. Ragan, F. C. McKinley and S. R. Bonner—a portion refusing to take the oath.

Notwithstanding the possession of the $250.000 in specie, it was thought inexpedient to commence banking; and it was resolved to loan out the capital stock of the bank (except about 2 per cent. retained for contingent expenses) to the stockholders, or to others, should they decline taking it, upon their notes, properly secured and due the first of October

next thereafter, which was done.    And for these notes, checks·
were given, for corresponding amounts, to each stockholder,
on the Bank of Columbus.    The Planter's & Mechanic's Bank
held these notes of the stockholders, until the second of Feb-
ruary, 1838, when a new election was held, agreeably to the
provisions of the charter.    General McDougald and others
were appointed directors, when McDougald was chosen pres-
ident.

One half of the money loaned, in 1837, to the stockhold-
ers, or twelve and a half per cent. on the capital stock, was
called in by the new board, which was paid in the bills of other
banks, then in a state of suspension; and at the same time,
an order was passed to issue $52.000, there then being only
about $800 or $1.000 of specie in the bank; and they com-
menced banking about ten days thereafter.    In a short time,
$198.000 more were ordered to be issued.    And the return
made in April, 1838, shows that $250.000 had been issued,
up to that time.    The next issue was $100.000.    The plates
had been prepared and the bills struck off, during the admin-
istration of General Bailey as president; still, no bills were·
put in circulation until February, 1838, when General Mc-
Dougald had succeeded him in that office.    Bailey ceased to·
be either a director or stockholder, after the 5th of February,
1838.

It is unnecessary, for the purposes of this case, to trace the
history of this bank further.    That it was constituted accord-
ing to the fundamental provision of the charter, requiring·
$250.000 in specie to be paid by the subscribers *in limine*,
is not pretended.    That it was organized against the declared.
will of the Legislature, in the very face of the law under·
which it drew its breath, is beyond a doubt.    Had the $250.--
000 in specie, actually been paid in, and deposited specially
for safe-keeping, in the vaults of the Columbus and Insu-
rance Banks, I do not deny but that the certificates of their
cashiers would have sufficed.    But here, no specie was ad-
vanced by the subscribers, nor deposited in these banks.    As·
well receive, therefore, any thing else, which an accommoda-

tion construction would call cash, as the cashier's certificate, furnished under the circumstances, that these were. They were neither specie nor its representative, much less its equivalent; consequently, one cannot hesitate, upon reading the evidence in the record, to pronounce the whole transaction a mere evasion of the charter.

[6.] It is needless to quote the authority of this or any other Court, in support of the doctrine, that no one shall derive a benefit from the violation of the law; or what, in legal effect, is the same thing, from a fraud practised by himself or others, to his own advantage. This is unquestionably the rule of the Common and Civil as well as the Moral Law. No polluted hands shall touch the pure fountains of justice, is a maxim in all law. And the simple question is, was the participation of General Bailey in those preparatory, illegal, we will not say fraudulent, proceedings, such as to prevent his administrator from maintaining this action?

It is urged, that General Bailey had dissolved his connection with this bank, both as president and stockholder, before a single bill was issued and circulated. And this is true. He was not in "at the death," therefore. But was he not the "avant courier" of this financial enterprize? The *alpha*, if not the *omega* of a monetary project, terminating, in a few years, in wide-spread mischief and ruin? He may be less culpable than others who aided and abetted, from the beginning to the end, *ab ovo usque ad mala;* still, was he altogether guiltless? He and others put the ball in motion. He gave it a tremendous shove the 9th of May, 1837, when as president, he notified the Governor, under his official oath, that "the sum of $250.000, in specie, had been *collected of the subscribers*, and paid over to the directors, by a committee of the stockholders, and that the same was then at their control in the Bank of Columbus, *being there deposited for safe-keeping*." And that the provisions of the charter, requiring this to be done, before any bills could be issued, had been "strictly and literally complied with."

McDougald, adm'x, &c. *vs.* Bellamy, adm'r, &c.

Without this report to the Executive, no bills could or would have been issued; with it, there was nothing to hinder. And however conscientious the General may have been in making this statement—and I would be the last man living to impeach his sincerity—it is not altogether certain that a substitute could have been found to take his place and perform this service. It is in proof that a portion of the directors declined in uniting in this representation. And now that the banking mania has subsided, and we contemplate, coolly, the difficulty and distress which it occasioned, we are not astonished at the scruples of those who refused to participate in these extraordinary measures.

After all, I do not understand this halving and quartering a violation of the law. In law as in morals, he who is guilty in part, is guilty of the whole. It would be like the case mentioned in Tristam Shandy, of the Abbess and the Nun, where it was necessary to pronounce a certain criminal word to make their mules move with their carriage; it would have been a sin for either of them to utter the entire word, but they divided it into two parts; one articulated one part, and the other the other; and thus, effected their purpose and avoided all the sin of the expression. Men break and enter a house, with intent to commit a felony. One, after entering, immaterial for what cause, stops short, but the others proceed to consummate the original design, are not the whole guilty of burglary? One ships goods to the coast, with a view to import them contrary to the Revenue Laws, and sells out to his confederates, who actually introduces them. Are they not all smugglers?

I protest against being understood as intending to be offensive in the employment of these comparisons. I use them only as apt illustrations of the principle I wish to enforce; for I am fully persuaded, in my own mind, that the organization of this bank is not tainted with that moral turpitude which is generally ascribed to it; and which I am bound, in candor, to say, appearances would indicate.

There is one other view of this subject, which is entitled to

some consideration. General Bailey was one of the corporators to whom this charter was granted. (*Prince*, 124.) It appears, from the testimony of Ragan, that there was distributed to him 188 shares of the stock. On that, he was bound, by the charter, to pay twenty-five per cent. or $4.700 in specie. He was one of the committee. to whom the money was paid, if paid at all; and who knew the fact, if it was not. Did he pay it? Did he deposit it in the Bank of Columbus? The testimony puts this matter beyond cavil. The specie was not paid—was not deposited.

Here is proof positive, then, not only that the charter was wounded in this vital provision, *but that General Bailey knew it.* And yet, he takes the initiatory steps in organizing the bank; and having done this, transfers his stock to enable his successors to finish the work which he had begun; and it may be, that he sells to advantage, because of what was done. And now, his administrator comes into a Court of Justice and asks its aid, to make the stockholders (of whom, so far as liability for redemption is concerned, he is one,) personally responsible for the bills which his intestate had obtained at a great depreciation!

We are clear that the action cannot be maintained; the issuing of these bills, resulting as it did, directly from the previous unlawful acts of the plaintiff's intestate. And we say to him, and to all such, in the language of the classical quotation adopted by old Chief Justice *Wilmot,* in *Collins against Blantern,* (2 *Wilson,* 347,) "*Procul, O procul este profani.*"

[7.] We come now to the last assignment of error. It is predicated upon the refusal of the Court to give the charges set forth in the 10th 12th, and 17th requests.

The substance of the position occupied by the plaintiff in error, is this: That the bank, having been illegally organized on account of the failure of the subscribers to pay, *bona fide,* in advance, the sum of $250.000 in specie, as required by the fourth section of the charter, the election of directors, and the issuing of notes by them, as well as every other act done, or contract made by the said bank, was illegal and

void; and that, consequently, no cause of action could accrue to the administrator of Bailey, upon the bills held by his intestate.

We controvert this proposition; and hold the following to be the true doctrine: That, conceding the bank to have been organized, and the bills issued without the actual payment of the $250.000 in specie, required by the charter; and that, by reason thereof, the State might, at any time, have re-called its corporate franchises; or a stockholder have resisted the payment of stock; or a debtor his liability to the bank, provided the rights of third persons were not prejudiced; still, it is a valid corporation, so far as to make it liable to creditors for its own acts, and its stockholders liable to bill-holders, under the 11th section of the charter for the ultimate redemption of the bills put in circulation by the bank.

I should regret, exceedingly, to find that we were chained down, by law, to hold any other doctrine than this. I want no case to support it, it is so obviously right in itself. It is enough for me, if there be no controlling authority against it. And I am quite sure there is not. We would not stir a single pebble of the law, or pervert a tittle thereof. I have examined, carefully, all the precedents referred to by Counsel, and while it is true that there are detached passages in some of the opinions or general expressions used, which, taken by themselves, are susceptible of the construction imputed to them; yet, by looking at the exact case under consideration at the time, and taking the whole opinion together in all its bearings, it could be easily shown that no such judgment was intended to be given by the Court, as would support the opposite opinion.

My first thought was to review the authorities cited by Counsel for the plaintiff in error; but the space occupied in our Reports by these bank cases, has become the subject of serious complaint by the profession, not immediately interested in this litigation; (the continuation of which is so prejudicial to the financial reputation, and consequently, the commercial prosperity of the City of Columbus;) I shall there-

McDougald, adm'x, &c. *vs.* Bellamy, adm'r, &c.

fore pretermit my purpose, at least for the present. Should the cases relied on be re-produced to the same point, as authorities have been on other occasions, I may be forced, as heretofore, to discharge this duty.

But suppose it be true, as it is not, that neither the corporation, itself, nor the bill-holders are liable, because of the illegal organization of the bank, was it not competent for the State, the other party to the contract, to relax any or all of the provisions inserted, for the protection of the public? In that event, although the $250.000 was a condition precedent to the existence of the corporation, still, if the State, representing the people, saw fit to permit the bank to exercise the charter privileges conferred upon it, notwithstanding this omission, she had a perfect right to do so. And it is not for the other party to complain. If the State did not desire or seek to avoid the charter on account of this omission, misconstruction of the law, fraud, or whatever else you please to call it, the other party cannot be heard nor treated as absolved from the performance of their obligations.

It seems, then, that in December, 1840, the Legislature passed an Act to cause judicial proceedings to be instituted against several defaulting banks, which had failed to redeem their bills in specie. (*Cobb's Dig.* 115.) In December, 1841, another Act was passed to arrest these proceedings, provided the banks, implicated, should resume and continue specie payments, on and after the first day of January next ensuing, and pay all costs which had accrued, and the Attorney's fees. (*Ib.* 117.) In December, 1842, these banks having failed to comply with the conditions imposed by the Act of 1841, an Act was passed, making provision for the appointment of receivers upon judgments of forfeiture being rendered, to take charge of the assets of these corporations, and to wind up their offices. In none of these Acts were the banks named, to which their provisions were made applicable. But by the Act of 1843, (*Ib.* 120–'1,) it is made manifest that the previous litigation referred to, was intended for the Planter's & Mechanic's Bank of Columbus, amongst others. Indeed, the

judical records of the country, as well as the history of the times, leaves no doubt as to a matter that is not questioned.

Here, then, we have, in 1841, a re-affirmance of the charter granted to this corporation; in which, it is solemnly stipulated by the State, that notwithstanding the failure on the part of the stockholders to pay the $250.000 in specie, required by the charter, or any other default; still, the bank may continue to exercise all the rights originally granted, provided it would resume and continue specie payments at the beginning of the following year. Had this been done, the faith of the Government was pledged, that the past should be forgiven. It was, to all intents and purposes, a Statute-pardon. An assignment having been made by this bank to Robert B. Alexander, under the Act of 1841, it is ratified by the Act of 1843, and declared valid for all purposes, both in Law and in Equity. Proceedings have been had under this assignment from that day to this ; and it has never occurred to any one to attack the assignment, upon the ground of the incapacity of the bank to make it.

When the information, in the nature of a *quo warranto,* was filed against this bank by Col. John H. Watson, as the Solicitor General of the Chattahoochee Circuit, to forfeit its charter, what is the gravamen of the complaint? Not the failure to pay the $250.000 in specie ; no, that is not mentioned ; but the charge brought against the corporation is, that "one James M. Wesson, on the twenty-third day of June, 1841, presented a five dollar bill, issued by said bank, at its counter, and demanded payment in gold or silver, which was then and there refused !" And *it was* for this that the "liberties, privileges and franchises" of the Planter's & Mechanic's Bank of Columbus, were seized and reclaimed by the State. It was born—lived some five years, issuing bills, selling exchange, and performing all the ordinary functions of a bank, and died ; or rather, was executed, and no allusion was ever made to the failure to pay the twenty-five per cent. in specie, on the capital stock !

And, yet, we are now gravely told, that no such corpora-

McDougald, adm'x, &c. *vs.* Bellamy, adm'r, &c.

tion as the Planter's & Mechanic's Bank of Columbus ever existed; or was capable, in law, of issuing bills, or otherwise contracting, or being contracted with. That it was a phantom bank ! That all this Legislation, directing its charter to be forfeited for refusing to redeem its bills in specie; for the ratification of the appointment of a receiver by the bank, and for the collection and distribution of its assets, was a farce.

Such an idea is as repugnant to law as it is to natural justice and that good faith, which it is one great object and design of Courts of Justice to compel the observance of. It would as ill comport with the honor and dignity of the State, as it would be grossly and cruelly unjust to third persons, under such circumstances, that this charter should be pronounced void, on the ground of the original illegality in the organization of the bank. The State has never complained of this injury ; but it is sought to be taken advantage of by those whose only complaint is, the disobedience to the law on the part of the stockholders themselves. " Neither the public interest nor public policy, nor regard for public morals, demand such vengeance to be inflicted on the public themselves; no such sacrifice of innocent victims, to appease the indignant spirit of a broken law." (*Per Duncan J.* 8.  *S. & R.* 219.)

The corporation, itself, then, being clearly estopped, as is not strenuously controverted by a portion, at least, of the very able Counsel who have argued this cause, and that, too, upon Common Law principles, independent of the statutory ground upon which I have mainly rested this opinion, can the stockholders set up this defence against the bill-holders? We think not ; and for reasons which we shall offer, apart from their long acquiescence in the re-affirmance of the charter, upon the single term proposed by the State, namely: the resumption of specie payments; an obligation binding upon the bank *ab initio*, and which did not need any supervenient legislation to create.

If a corporation may contract by promise, express or implied—also, by assent and acquiescence, why may not the

ratification of the stockholders be presumed, by suffering time to elapse, during which they ought to have dissented. (1 *W. & S.* 101.   12 *Wheaton,* 73.)

The argument in behalf of the bill-holders, is briefly this: "We grant, that under the 11th section of the charter, the persons and property of the stockholders are bound for the redemption of the bills and notes issued by the bank; but it is only for such bills and notes as are thus issued, and not for such as may be issued by others, contrary to law; that the directors are the agents of the corporation, but not of the stockholders; and although the bank may be made liable, the stockholders did not undertake to redeem all the bills and notes for which the bank might be made liable, but only such as the bank issued."

[8.] It is not denied, and if it is, the books are full to the point, that the directors are the agents of the bank, and that they are clothed with authority to issue bills. This being assumed, let us ascertain to what extent the bank is bound by the acts of the directors.

The general rule upon this subject is, that every principal is held liable to third persons in a civil suit, for the frauds, deceits, concealments, misrepresentations, torts, negligences or other malfeasances and omissions of duty of his agent, in the course of his employment, although the principal did not authorize, or justify, or participate in, or, indeed, know of such misconduct; or even if he forbade or disapproved them. (*Story on Agency,* §452.)

In every such case, the principal holds out his agent as fit to be trusted; and thereby, in effect, warrants his fidelity and good conduct, in all matters of the agency.

[9.] The doctrine, that a corporation can only, through its agents, do *right,* and is not responsible for their *wrongs,* is exploded. (9 *S. & R.* 94.   16 *East.* 6.   5 *Wheaton,* 326.)

[10.] Again: The authority of the cashier or directors to bind the bank, is just such as these officers are held out to the public, by the charter, to possess, according to the general usage, practice and course of business of such institu-

tions; and their acts, respectively, within the scope of such usage, practice and course of business, binds the bank in favor of third persons having 'no knowledge to the contrary. (*Story on Agency*, §114.)

This charter holds out the directors to the public to possess the power, according to the general usage, practice and course of business in banks, to issue bills. These bills were issued within the scope of such usage, practice and course of business; consequently, the bank is bound, notwithstanding. an over-issue, to redeem the bills thus put into circulation.

[11.] For it is well established, that where one of two innocent persons are to suffer from the tortious act of a third, he who gave the aggressor the means of doing the wrong, must alone bear the consequences of the act.

[12.] With these guiding rules before us, we insist, that beyond all doubt, the Planter's and Mechanic's Bank of Columbus were liable for the redemption of the bills issued by order of the directors, whatever the amount might be. They were the agents of the bank, to issue bills. They acted within the scope of their authority, and the course of their employment. Their misconduct, therefore, cannot shield the bank from liability to bill-holders, who were ignorant of such misfeasance. The corporation held out the directors as fit to be trusted; and thereby, impliedly warranted their fidelity in the discharge of their duty.

Were the directors of a rail road company, having no banking privileges, to issue bills, the public would take them at their peril; no liability would attach to the company, because no such power was designated by the charter. Not so, however, with a banking company. Here the right to issue bills is conferred upon the corporation, and through it, upon the directors; and whether they make an over-issue or not, cannot be known to strangers. In the one case, the directors are guilty of a usurpation of power; in the other, of an abuse of it only.

Upon the same principle, the case of *Coleman against the*

*Representatives of Bulloch and Wells*, cited by Col. Jones, as having been decided by the Judges in convention, may be justified. It was a suit to recover 'change bills, the issuing of which were forbidden by law, under a penalty. No one could claim to be the innocent holder of such bills, because every person is bound to know the public law. So of the case of *Crary et al. vs. The State of Missouri*, (4 *Peters*, 410,) which the senior Counsel considers the same *ad unguem* to the one at bar. And what was the judgment of the Supreme Court; or rather of the majority of that bench, some of its ablest members dissenting? Why, that a promissory note, given for certificates issued at the loan office, and payable to the State of Missouri, was void, because those certificates issued under an Act of the Legislature, were "bills of credit;" and therefore, that their emission was prohibited by the Constitution of the United States, which declares that no State shall "emit bills of credit."

Who does not see, at a glance, the difference between all this class of cases, (and from such and elementary *dicta* to the same purport, the briefs of Counsel are made up,) and that under consideration? They are as wide as the poles apart. In the one instance, every man can read the charter, public law or Constitution, and determine, for himself, what is legal and what not. And all the community stand upon the same footing, in this respect. But who can know, except the stockholders themselves, whether the $250.000 was paid in specie. Or whether the bills issued by the bank at any given period, exceed three times the amount of the capital stock actually paid in? The idea, that he who takes the bills of the bank is to lose his property which he has honestly parted with, because the stockholders or the bank have not done their duty to themselves, is unreasonable to the last degree. It seems strange, indeed, and sounds strange, to an unsophisticated ear. No precedent has been found, I feel quite confident, none can be, to sustain such a doctrine.

[13.] Such, then, being the nature and extent of the liability of the bank, how does it affect the stockholders? To

McDougald, adm'x, &c. vs. Bellamy, adm'r, &c.

solve this inquiry, we must look to the terms of the charter itself, for it is not pretended that the directors are the agents of the stockholders. The stockholders are not responsible for the misconduct of the directors, unless they have agreed to make themselves so.

By the 11th section of the charter, it is stipulated and agreed, by and between the State of Georgia on the one part, and the present and prospective stockholders of this corporation on the other part, in consideration of the franchise granted, that amongst other things, as greater security to the public, the persons and property of the stockholders should be pledged and held bound, in proportion to the amount of shares and value thereof, that each individual or corporation might hold in said bank, for the ultimate redemption of the bills or notes *issued by said bank.* (*Prince*, 127.) To uphold the argument, how important for the stockholders that it should have been inserted, " provided the $250.000 in specie, required by the charter to be paid in by us, the stockholders, be paid before any directors are elected or bills issued by the bank ; and provided, also, the circulation does not exceed three times the amount of the capital stock actually paid in."

This is plain—the general law of agency makes the bank liable for the bills ; and the stockholders have made themselves so, by their express agreement. Were these bills *issued by the bank,* viz : by the directors, who were the agents of the company to issue bills ? If so, the stockholders have stipulated, that if the corporation is unable to redeem them, they will. But for this guaranty, the charter, probably, would not have been granted. We have good reason to believe this, seeing, as we do, that similar security was super-added to every other cotemporaneous bank charter. The public have a right, then, to look to it and demand its execution, in their behalf. The contingency having happened upon which this additional remedy accrued, to-wit : the insolvency of the corporation, the people are entitled to look to this ultimate redress.

Only settle that these bills were " *issued by the bank,*" and

the controversy is at an end. Were they not so issued ? If not, by whom, pray, were they issued ? Did the bank, before its dissolution, or its assignee, since, in the numerous suits instituted upon their bills, ever repudiate them ? Have not judgments been uniformly recovered against the bank, upon these bills ? Has the bank, by plea, ever repudiated the act of the directors, in this respect ? After the authoritative recognition of the defence here set up, and enunciation of it, there would be found few rational persons dealing with banks. It would destroy public confidence and shake the foundation of paper currency, by sweeping away, at once, every substantial liability of monied corporations, and leave all persons, unwise enough to deal with them, at the mercy of every faithless officer in their employment. To quiet the community, and to maintain and uphold the best interests of society, we proclaim, that no such doctrine exists.

We have ever looked to the plain and obvious meaning of the charter, itself, for our guidance in these bank cases. By this means, we steered safely between the projecting shores, when these questions were new to us. Time, reflection, reexamination, and the judgment of the highest Judicial authority, have approved our course. We shall look steadily to the charter in time to come. It is its own best expositor; and whether we decide according to its letter or spirit and reason, we are equally clear, that these stockholders are liable to redeem all the bills issued by the bank, whether there be many or few—one million or three million of dollars, provided there be no corporate effects out of which the creditor can be satisfied.

I *profess* no sympathy for the parties in this endless litigation; and I sincerely trust, that in our future discussion, no extrinsic appeals of this sort may be deemed necessary, by Counsel, in discharging their duty to their clients. There are, or were, many unfortunate bill-holders, who have sustained heavy loss, and have realized nothing from the scattered fragments of this broken bank; and, on the other hand, there are stockholders, or their surviving families, who have

been beggared by the mal-administration of this institution. We feel for all, and for all alike. But these considerations can have no influence with this or any other Court, in adjudicating positive law. Placing all upon the same level, and disregarding all private griefs and grievances, which had better be indulged any where else than here, we shall endeavor, in the exercise of an independent judgment, to hold the scales in equipoise, looking alone to the laws of the land.