## FOUCHE & FOUCHE *v.* MERCHANTS NATIONAL BANK OF ROME *et al.,* and *vice versa.*

1. Where, in a suit by creditors of a corporation against a shareholder for an unpaid subscription to stock, the defendant pleads that he was not the owner of such stock as alleged at the time the creditor contracted his debt with the corporation, a contract made and entered into by such defendant, indicating on its face that he was a stockholder at a certain time, and tending, when taken in connection with other evidence introduced and admitted on the trial, to contradict his answer as to the time when he claims to have ceased to be a stockholder by a sale and transfer of his stock to another, is not irrelevant; and the court erred in rejecting the same.

2. A mere recital in a stock certificate that the shares therein specified are " full paid and non-assessable " will not protect the person named in the certificate as the owner of such stock from liability for an unpaid subscription thereon, if he in fact purchased the stock with knowledge that the subscription was due.

3. The knowledge of a president of a bank that certain stock had not been fully paid up is imputable to the bank, if he, acting for it and in its behalf, accepted a transfer of the stock to it, and it thereunder retained the same.

4. In order to enable a creditor of a corporation to recover from one alleged to be a stockholder therein, and as such liable upon an unpaid stock subscription, it must appear that the defendant was in fact such a stockholder at a time when he was in law so liable. The testimony in the present case did not authorize the judge to conclude, as matter of law, that the defendant Armstead was not such a stockholder at the time the services of plaintiffs to the corporation issuing the stock, the basis of this suit, were rendered.

5. A party may introduce in evidence relevant portions of the minutes of a corporation without being required to introduce all of its minutes relating to the matter under investigation; the right, of course, being in the opposite party to introduce other portions of such minutes as are pertinent to the issue.

6. It is not erroneous to allow a witness, who professes to know the fact, to testify that certain securities have never been delivered to a corporation; and this is so irrespective of what may appear with reference to this matter upon its minutes.

Argued April 26, — Decided May 16, 1900.

Equitable petition. Before Judge Henry. Floyd superior court. October 19, 1899.

*Fouche & Fouche, J. Branham,* and *W. S. McHenry,* for plaintiffs. *Neel & Neel* and *Nat Harris,* for defendants.

LEWIS, J. R. T. and J. S. Fouche, as partners under the firm name of Fouche & Fouche, brought suit in the superior court of Floyd county against the Rome Electric Light Company, the Merchants National Bank of Rome, Ga., and T. M. Armstead. The petition makes substantially the following case: The Rome Electric Light Company is a corporation chartered by the superior court of Floyd county on July 19, 1892, its capital stock being fixed at $50,000.00, divided into shares of the par value of $100.00 each. The Merchants National Bank of Rome, Ga., is a corporation under the laws of the United States, with its principal place of business in the city of Rome; and said Armstead is a citizen of the State, residing in Fulton county, Ga. The $50,000.00 of capital stock in the Rome Electric Light Company was subscribed about July 19, 1892, and soon thereafter said company was organized under said charter, commenced the business for which it was chartered, and became indebted to divers persons. This company, its officers and agents, neglected and refused to call for and collect the subscriptions to its capital stock, and the same remain wholly unpaid. The company became insolvent, and unable to pay its debts. All its visible property had been seized and sold, together with its franchises, the officers conveying to the Rome Lighting Company, a new corporation, all its property, assets, and franchises, and it has ceased to do business and exists in name only. The Merchants National Bank of Rome, Ga., is the owner and holder of 190 shares, and T. M. Armstead is the owner and holder of 58 shares of the capital stock of said Rome Electric Light Company; said shares are wholly unpaid and are still due to said company by reason of the neglect and refusal of said company and its officers and agents to call for and collect the same. On September 21, 1897, petitioners, in the city court of Floyd county, obtained a judgment against said Rome Electric Light Co., for $2,000.00 principal, and $100.10 interest to that date, with costs of suit, and execution was issued on said judgment September 29, 1897, and placed in the hands of the sheriff of Floyd county, who, after diligent search, was unable to find any property on which to levy the execution, and, on June 23, 1898, made a return of nulla bona thereon. The petition, after a prayer for process

against the defendants, prayed that the Merchants National Bank of Rome, Ga., and T. M. Armstead be decreed to pay into court the amount of money due or unpaid on the shares of stock of the Rome Electric Light Company held and owned by them respectively, or a sufficiency thereof to pay off and discharge plaintiffs' debt. There was also a prayer for general relief.

To this petition the bank and Armstead filed separate answers. Among the allegations in the answers was one, in substance, to the effect that said stock was subscribed for and entirely paid in accordance with the legal advice furnished by the firm of Fouche & Fouche, plaintiffs in this case, and that plaintiffs, with full knowledge of the condition of said stock, permitted it to be transferred and placed in the hands of innocent purchasers as full paid and non-assessable stock. The bank denied that it was the owner and holder of 190 shares of stock in the Rome Electric Light Company; it alleged that 100 shares of said stock, of the par value of $10,000.00, were conveyed by J. King to it, in part settlement of a very large indebtedness owed by King to the bank; that plaintiffs were the legal advisers of King in the transaction, and advised and assisted in the settlement of the transactions between the bank and King, by which King was relieved of the amount of $10,000.00 of his large indebtedness to the bank, in consideration of the transfer of said 100 shares of stock; that the bank received the stock from the hands of King, he acting under the advice of his counsel, Fouche & Fouche, believing it to be fully paid up stock, with no knowledge or notice that it was not fully paid, or that any part of the original subscription due from King remained unpaid. Ninety shares of the stock, on July 5, 1895, were by King, under the advice and direction of his attorneys, placed in the hands of the defendant bank as collateral security only, and title to said stock never vested in the bank. Plaintiffs' action, if any they have, is against their client, King, on said 90 shares of stock. The answer further averred that the stock, before its transfer to the bank, was fully paid by the original holders; that defendants were innocent purchasers for value, without notice of any right or claim in favor of the plaintiff or any person against the stockholders or corporation; and that plaintiffs were

estopped by laches from prosecuting their claim. Armstead, in his answer, denied that he was the owner and holder of 58 shares of stock in the Rome Electric Light Company. On the contrary he averred that he did not own or hold one share of said stock, and has not held any of the same since plaintiffs' claim accrued against said company. He admitted that he acquired certain stock by purchase in the open market long after the same had been issued, having bought the same as fully paid up, in the utmost good faith, for a valuable consideration, and without any notice that the same had not been fully paid up. He had nothing to do with the organization or management of the company, was not an original subscriber to the capital stock, came into possession of the stock in due course of business, and had parted with the same, duly transferring and assigning it to J. L. Bass, prior to the filing of the suit by plaintiffs on which their judgment was rendered, and, as informed, prior to the rendition of the service on which their claim was based.

We cull from the voluminous record the following condensed statement of such facts as we deem essential to a clear understanding of the issues involved: One J. S. Lawrence subscribed for 478 shares of the capital stock of the Rome Electric Light Company, the same to be paid for in full by a conveyance and delivery to the company of first mortgage bonds of the Rome Street Railroad Company, of the par value of $25,-000.00, an incandescent electric light plant of a certain capacity, 1,000 incandescent lamps, 25 arc lamps, station equipment for incandescent plant, 2 5-8 miles of line construction, all expenses in putting up machinery and running line construction to be borne by said Lawrence. It appears from the testimony that none of these bonds of the Rome Street Railroad Company were ever received by the Rome Electric Light Company on this payment of stock, and that all the property received from Lawrence did not amount to over $2,500.00. The evidence also tends to show that none of the other stock subscribed for was ever paid to the company. A certificate of 100 shares of stock, dated July 12, 1894, to the Merchants National Bank, and a like certificate to said bank for 90 shares of stock, dated July 5, 1895, were introduced in evidence. At the top of each cer-

tificate along its margin appear the words, "Full paid and non-assessable." Attached to the latter certificate was a contract bearing the same date, and signed by J. King, to the effect that the 90 shares of stock should be held by the bank as security for any and all indebtedness of King to said bank, as principal, indorser, or security. The cash-book of the Merchants National Bank of Rome, under date April 25, 1895, showed an entry of stocks and bonds in the Rome Electric Light Company, $10,-000.00; Street Railway Company $5,600.00, aggregating $15,-600.00. The minute-book of the Rome Electric Light Company of date May 22, 1897, introduced in evidence, showed a meeting of the stockholders of that company, from which it appears that J. L. Bass, as president of the Merchants National Bank, represented 189 shares of stock, and that J. E. Dean, proxy for T. M. Armstead, represented 58 shares of stock. The minutes showed that on the same day a meeting of the directors was had, at which the president and secretary were directed to sign a deed " conveying all the property of the Rome Electric Light Company to the Rome Lighting Company." The resolution asserted that the deed was made in conformity with a certain decree in the United States circuit court for the northern district of Georgia.

It substantially appears from the testimony of J. King, that he was president of the Merchants National Bank of Rome during the year 1894, and held that office until the suspension of the bank some time in June or July, 1895; that the bank became the owner of the 100 shares of stock in the Rome Electric Light Company on July 12, 1894, and also afterwards the owner of the 90 shares; that this stock was originally owned by King, and was transferred by him to the bank while he was president thereof, the 90 shares being transferred as collateral security for King's indebtedness to the bank; that during the transaction of this transfer he.dealt with himself as an officer of the bank, he being at the time its president; that plaintiffs had nothing to do with the organization of that company, or with the issuing or distribution of its stock. Plaintiffs had not, up to that time, represented the company, and their services as attorneys for the company began some time in the year 1896.

A transfer to the bank was made on account of King's obligations to it, and the certificates were issued some time before the employment of plaintiffs. King never had consulted with plaintiffs about his affairs with the bank. This witness thought that plaintiffs, or at least the older member of the firm, R. T. Fouche, knew before his employment that the stock subscribed to the Electric Light Company had not been paid up. He stated that Fouche frequently told him that the stockholders were liable for the payment of that stock. It further appears from his testimony that nothing was paid on this stock to the company, except property worth about $2,500.00, by Lawrence, on his subscription of $50,000.00. When King took credit for the $10,000.00, as shown by the books of the bank, he transferred to it the 100 shares of stock, and $12,000 of bonds of the Rome Electric Light Company. It further appeared from his testimony that when stock was sold by one person to another, the old certificate held by the original subscriber for the stock was taken up, and a new one issued to the transferee, and that this was placed upon the minutes or books of the corporation. R. T. Fouche testified that his firm had nothing to with the organization of the Rome Electric Light Company; that they were first retained by that company about July 1, 1895, and prior to that time they had nothing to do with it or its affairs. He supposed he ascertained after the employment of his firm by the company as attorneys that it did not have any $50,000.00 in stock paid up. On April 3, 1896, a settlement was had between this company and the bank, and he likewise had a settlement for the fee due by the company to his firm up to that date, certain bonds of the Rome Electric Light Company being deposited with him for a fee amounting to $1,200.00 or $1,-500.00, which was afterwards settled for $600.00. After this settlement, plaintiffs continued to represent the company until they brought suit and recovered a verdict for the sum of $2,-000.00, besides interest. His firm had no connection with this company at the time this stock was issued; knew nothing about it until after they were employed as attorneys, and only knew in a general way that this stock had not been paid up. Plaintiffs knew nothing of King's financial condition until after the

bank suspended, and advised him that he was liable for his unpaid stock. King never told plaintiffs anything about the details of the stock, but simply about Lawrence's conduct. Before the settlement in April, 1896, witness knew that the stock of the company had not been paid, and that it had issued 500 shares. Plaintiffs only sued the Merchants National Bank as the owner of 190 shares, and Armstead as the owner of 58 shares. Did not sue the other stockholders, because the other stock was owned by Sam King, and he was always willing to pay his share of what they owed plaintiffs. He has not paid, but they could have settled with him at any time. Plaintiffs had nothing to do with the transfer of the stock or bonds to the bank; never heard of it until after it was done; never saw the stock book of the Rome Electric Light Company until the summer of 1896; never did notice the words, "Full paid and non-assessable," until they were brought to his attention by exhibiting a certificate to him as a witness in this case. These words were so arranged on the margin that he had never noticed it before. In October, 1895, he thinks, he knew of the condition of the subscription to the stock. This doubtless referred to the $50,-000.00 subscribed by Lawrence, and it was to be paid in property and bonds of the Rome Street Railroad Company. He had never had any consultation with Armstead at all about anything. He never saw the stock book or certificate of stock until the day on which he testified; and knew nothing about the issuing of the bonds, or the transfer of the stock to the bank.

After the introduction of testimony in behalf of plaintiffs, counsel for defendants moved for a nonsuit on the following grounds, which are briefly but substantially stated: 1st. On account of the entry on the certificate of stock of the words, "Full paid and non-assessable," there could be no recovery by the plaintiffs unless the proof showed the stock was never paid, and this fact was known to the defendants at the time it was transferred to them. 2d. Because the plaintiffs can not recover if it appears that at the time they extended credit the stock was not paid up, and that was not known to the present holder, he not being an original stockholder; and at the time of extending the credit the creditor, plaintiffs in this case, did know of

53

its non-payment.    3d.  The burden is on the plaintiffs to prove non-payment of stock and notice to the transferees thereof. This is an equity case, and the equity of the bank and Armstead is greater than that of plaintiffs.  Where plaintiffs permit a transaction to proceed, they can not afterwards take advantage of it, having knowledge of it, against a party who did not have knowledge of it at the time.   They are estopped by their action.

The court sustained the motion for a nonsuit, to which judgment plaintiffs except.   The bill of exceptions also assigns error on the judgment of the court excluding from the testimony a certain contract tendered by plaintiff's counsel, entered into by the bank and by Dean & Dean, as attorneys for Armstead, which contract is set forth in the record.

1.  It appears from the record that the plaintiffs offered to read in evidence a certain contract made February 14, 1896, between Dean & Dean, as attorneys for T. M. Armstead, of the first part, and the Merchants National Bank of Rome, Ga., of the second part, by which the parties of the first part, as stockholders in the Rome Electric Light Company, agreed to abandon their proposed attack on the validity of certain bonds issued by said company so far as $12,000.00 worth of said bonds were concerned that were held by the bank.   As to these bonds the same would be recognized as valid and bona fide obligations of said Rome Electric Light Company.   They further agreed to recognize and acknowledge that the party of the second part held obligations to the amount of $1,600.00 principal, with interest thereon from the date of the contract at 8 per cent. per annum, against the Rome Electric Light Company, independent of said bonds; and they agreed that said last-named indebtedness should remain as an obligation against said Rome Electric Light Company, or against the property thereof, or the proceeds thereof, and should be paid thereby or therefrom regardless of any new combination that might arise with reference to said Rome Electric Light Company, or its property.   The said attorneys further agreed to represent the interests of the party of the second part, in connection with the interest of their client, for the purpose of carrying out the terms and object of the contract, without compensation further and beyond the considera-

tion flowing to them through this agreement. It was further agreed that the party of the second part should have an interest in the Rome Electric Light Company, either in bonds or stock, or in the net proceeds from the sale of the property in the proportion of 4-20 to the party of the first part, and 12-20 to the party of the second part; it being understood that the additional 4-20 interest in said property was not dealt with in the agreement, for the reason that the same might or might not be owned by third parties. If third parties owned it, the same should be issued to them. If not owned and controlled by third parties, it should be divided between the parties at interest, preserving the proportion of the parties hereto as 4-20 is to 12-20. The coupon notes on $12,000.00 of bonds due October 1, 1895, and April 1, 1896, should be owned between the parties to the contract in the proportion of 4-20 to 12-20. It was further agreed that the interests of the parties to the contract in the Rome Electric Light Company should be combined, and each should endeavor to bring about a reorganization of the company upon a basis that would cancel all obligations of the company, except the $12,000.00 of bonds, owned by the bank, and interest thereon, and the $1,600.00 due the bank. It failing to maintain the validity of the bonds, the contract should become void; the court expenses and necessary disbursements to be borne by each party in proportion to their relative interests in the company. The contract should apply only between the parties, and no third person should have any interest or benefit thereunder, except by agreement after it was made.

Armstead denied in his answer that he was the owner and holder of any shares of stock in the Rome Electric Light Company. He admitted that he had once bought some, but stated, upon information, that he transferred the same prior even to the rendition of the service on which plaintiffs' claim for recovery was based. We think the court erred in ruling out this contract on the ground of irrelevancy. It was admissible at least to show that at the date of the contract Armstead was a stockholder in the Rome Electric Light Company. As above indicated, there were introduced proceedings of the meeting of the stockholders of the Rome Electric Light Company of date

May 22, 1897, at which meeting the minutes show that T. M. Armstead was represented by J. E. Dean, proxy, for 58 shares of stock. Taking that testimony in connection with the contract, the evidence tends to show that Armstead was the owner of stock at least from February 14, 1896, just before plaintiffs commenced their last service, for which they recovered judgment against the company, down to May 27, 1897, after this service probably was completed. This testimony could be considered in reply to Armstead's answer, and we think the court erred in not admitting the contract. It was argued by counsel for plaintiffs in error that it was an effort to bring about a reorganization so as to defeat the stock and claims of all persons except themselves; to divide the stock and bonds of the company, or the net proceeds of the sale of its property, among themselves to the exclusion of all other persons; and that such a written contract is material evidence in a suit against said persons to compel them to pay up stock held by them for the benefit of creditors of the company, when it is apparent that the debt sought to be collected was incurred in resisting the wrecking of the corporation by its stockholders. We think there is some force in the contention of counsel, that perhaps the contract is admissible for the purpose of throwing light upon the scheme of these defendant stockholders, who were parties to that contract. It was certainly admissible for the reasons above indicated, and should not have been rejected.

2, 3. It is a general principle of law, well recognized both upon authority and reason, that the transferee of shares of stock in a corporation is not only subrogated to all the rights and interests of the original subscriber and transferor of such stock, but such transferee also incurs the liability originally upon the subscriber to the stock for any non-payment of dues that may exist on the subscription. This is not merely an arbitrary rule of law fixed by courts in adjudications upon this subject, but is really founded upon solid reason. When an original owner of or subscriber to stock transfers the same, and the name of the transferee is entered upon the books of the company as the owner and holder of the stock, the original subscriber thereby, as a general rule, becomes discharged from all obligations to

the company by virtue of his subscription, and his transferee necessarily takes his place by an implied undertaking to assume those obligations and duties.　It is equally well settled, that creditors of an incorporated company who have exhausted their remedy at law can, in order to obtain satisfaction of their ·claims, especially if in judgment, proceed against the stockholders to enforce their liability to the company for the amount remaining due upon their subscription.　This principle was decided in the case of Hatch v. Dana, 101 ·U. S. 205, and it was there further held that the stockholder was liable to the ·creditor although no account was taken of the other indebtedness of the company, and the other stockholders were not made parties; though, by the terms of their subscriptions, the stockholders were to pay for their shares " as called for " by the company, and the latter had not called for more than thirty per ·cent. of the subscriptions.　The first proposition, that the transferee from the original stockholder succeeds to such liability, is also well established by authority.　In the case of Webster ·v. Upton, 91 U. S. 65, it was decided: " The transferee of stock is liable for calls made after he has been accepted by the company as a stockholder, and his name registered on the stock books as a corporator; and, being thus liable, there is an implied promise that he will pay calls made upon such stock while he ·continues its owner.　A purchase of stock is of itself authority to the vendor to make a legal transfer thereof to the vendee on the books of the company. "　In the opinion in that case is approvingly quoted the doctrine in Angell & Ames on Corporations, §534, as follows: "When an original subscriber to the stock of an incorporated company, who is so bound to pay the instalments on his subscription from time to time as they are called in by the company, transfers his stock to another person, ·such other person is substituted not only to the rights, but to the obligations, of the original subscriber, and he is bound to pay up the instalments called for after the transfer to him.　The liability to pay the instalments is shifted from the outgoing to the incoming shareholder.　A privity is created between the two by ·the assignment of the one and the acceptance of the other, and also between them and the corporation; for it would be

absurd to say, upon general reasoning, that, if the original sub-scribers have the power of assigning their shares, they should, after disposing of them, be liable to the burdens which are thrown upon the owners of the stock." Numerous authorities are cited in the opinion of Mr. Justice Strong, clearly sustaining the views of the court.

It is contended, however, in the answer of the bank in this case, that it was not owner of the 90 shares of stock, inasmuch as they were transferred to it by King simply as collateral se-curity for a debt due by him to the bank. It is a well-estab-lished principle of law that such a transfer of property, even though made solely as collateral security for the payment of a debt, conveys the title to the transferee. This principle has like-wise been decided by the Supreme Court of the United States in the case of National Bank *v.* Case, 99 U. S. 628, where it was announced: "A party who, by way of pledge or collateral security for a loan of money, accepts stock of a national bank which he causes to be transferred to himself on its books, incurs immediate liability as a stockholder, and he can not relieve himself therefrom by making a colorable transfer of the stock, with the understanding that at his request it shall be retrans-ferred." The same principle was also decided in Pullman *v.* Upton, 96 U. S. 328, where it was held that the transferee of stock, who caused the transfer to be made to himself on the books of the corporation, although he holds it as collateral se-curity for a debt of his transferor, is liable to the company, or its assignee, for the balance due on his original subscription. See able opinion of Mr. Justice Strong in that case on pp. 330-1, giving the reasons for such liability on the part of a transferee, even though he holds the stock simply as collateral security. Authorities might be multiplied upon this subject, but we deem it unnecessary, as we do not understand that there is any contest between counsel in this case as to the correctness of the principles above announced. See in this connection *Chatham Bank* v. *Brobston,* 99 *Ga.* 801; *McDougald* v. *Bellamy,* 18 *Ga.* 411.

It is contended, however, by counsel for defendants, that un-der the facts disclosed by this record the plaintiffs, when they

extended credit to the Rome Electric Light Company, had
knowledge of the fact that the stock subscribed thereto had not
been paid, and that therefore they are estopped from instituting
proceedings to recover their debt from the present defendants,
who were simply the transferees from the original stockholders;
that when credit was extended by plaintiffs to this company, it
was not with any idea on the part of plaintiffs to look to these
shareholders for the payment of their debt, or that faith for the
solvency of the debt was at all based upon the liability of these
shareholders.    A forcible argument is presented on this branch
of the case, and authorities cited which, at first blush, may seem
to give some plausibility for the contention of counsel.    We
think, upon a comparison of the authorities relied upon with
the facts in this case, and upon a fair and just discrimination
in construing the views of courts and learned law-writers, it will
be found that they have no application to the present case.    2
Morawetz on Private Corporations, § 829, is relied upon to
sustain the action of the court below in granting a nonsuit upon
this particular point.    It is there stated:   "Persons contract-
ing with a corporation may expressly or impliedly waive their
right to compel the shareholders to contribute the full amount
of the company's capital in discharge of the corporate obli-
gations.    If a person should contract with a corporation, or
voluntarily give it credit, knowing that its capital had not been
fully paid up, but was declared to be fully paid up for the pur-
pose of discharging the shareholders from further liability, the
evident intention of both parties would be to make the agree-
ment subject to these conditions; and there would be no equity
in charging the shareholders with any further liability on
account of the obligation so incurred by the company."   But
we think there is nothing in the record to authorize the judge,
in the trial of the case below, to assume that the plaintiffs, when
credit was extended to this company, knew that the stock of the
company had been declared to be fully paid up for the purpose
of discharging the shareholders from further liability, and
that it was the evident intention of both parties to make the
agreement subject to these conditions.    On the contrary, after
a careful review of the testimony, we find nothing which would

authorize the judge, as a matter of law, to conclude that the plaintiffs had any such knowledge.   R. T. Fouche testified, in effect, that he had no connection with issuing this stock, nothing whatever to do with the transfer of the same to these defendants, and never even knew, until the trial of this case in the court below, that the certificates which the bank held had printed thereon the words "full paid and non-assessable." It is true there is some evidence tending to show that he knew or had notice that this stock had not been paid up by the subscribers, or the holders and owners of the same, but it also appears in the testimony that he several times contended that the holders of this stock were liable to the company for its payment.   A bare knowledge of the fact on the part of a creditor, when he extends credit to a corporation, that its subscribers to stock, or the owners of stock, had not fully paid into the company the subscriptions thereto, does not by any means necessarily imply that the company regarded the .stock as fully paid up for the purpose of discharging the shareholders.   He could not have had such an idea when dealing with this company in behalf of his firm, because it would have been entirely inconsistent with his repeated declarations and opinion expressed, that the stockholders could be held liable for the payment of this money.   We can readily see how credit can be extended to a corporation with full knowledge of the fact that its capital stock has not been paid in; but at the same time the credit could be based upon the idea that the stockholders, or their transferees, could be made liable for its payment, if the company became insolvent; and the only way in which its creditors could recover anything on their debts would be by proceedings against shareholders for the amount due on unpaid subscriptions to stock.   For instance, in this case, the services rendered were simply those of attorneys at law.   The company, at the time of employment, was actively engaged in business, and it could naturally have been inferred that such incidental expenses as fees incurred during its operation would be met by income realized by the company in the conduct of its business.   But it does not follow that the creditor thus impliedly waived any right the law gives him to call upon the shareholders to discharge their legal duties to the corpora-

tion when he discovers that as the only means by which he can procure payment of its indebtedness to him. Certainly, there was sufficient testimony in behalf of plaintiffs to submit the issue to the jury as to whether the plaintiffs made any contract with the company either expressly or impliedly waiving their rights in law against the stockholders on account of unpaid subscriptions to stock.

The fact that subscribers to stock in the corporation entered with the company into any device or contrivance for the purpose of relieving themselves from liability for full payment of the shares for which they subscribed, can not be insisted on in any court of law, or pleaded against the rights of creditors who are not parties to such transactions, and who are entitled to protection for the trust arising under the law in their favor, and to require payment in good faith to the full amount of capital stock subscribed to the company. This principle has been decided in Camden v. Stuart, 144 U. S. 104, where it was held: "The trust arising in favor of creditors by subscriptions to the stock of a corporation can not be defeated by a simulated payment of such subscription, nor by any device short of an actual payment in good faith." See the able opinion of Mr. Justice Brown on p. 113, et seq. See also, on same line, Potts v. Wallace, 146 U. S. 689, and the opinion of the court on p. 703, where it is said: "So that, even if the company and the defendant had then agreed that the latter should then be exonerated from his liability to the company, such an agreement would have been void as against the creditors of the insolvent company." See also Richardson v. Green, 133 U. S. 30, and the opinion of Mr. Justice Lamar in that case on p. 45, and following. It seems in that case that Richardson, a director in the corporation, was also a stockholder therein, and that he made some arrangement with the company, in the course of his dealings, that he should never become liable upon any assessments for his subscription to stock. The court on p. 45 says: "We have seen that all the acts of Richardson as director, stockholder, chairman of the executive committee, and treasurer, all of which offices he held at one time, had their origin in this bonus stock. After having exercised all the privileges and powers of a stock-

holder in the corporation, it can not be seriously contended that he is to be held exempt from liabilities which would attach to a bona fide shareholder who has taken shares purporting to be paid up, but which in truth are not paid up." Citing the case of Scovill *v.* Thayer, 105 U. S. 143, 153, 154, the following is quoted from the opinion of Mr. Justice Woods: "The stock held by the defendants was evidenced by certificates of full-paid shares. It is conceded to have been the contract between him and the company that he should never be called upon to pay any further assessments upon it. . . But the doctrine of this court is, that such a contract, though binding on the company, is a fraud in law on its creditors, which they can set aside; that when their rights intervene and their claims are to be satis-- fied, the stockholders can be required to pay their stock in full."

But it is further contended in this case, that, as these certificates of stock issued to the bank had printed thereon words indicating that the stock had been fully paid up and was non-assessable, the burden of proof was on plaintiffs to show, first, that they had not been paid, and secondly, that the bank, as transferee, must have had knowledge of that fact, before it could be held liable by a creditor of the corporation in a suit of this character; that a bona fide purchaser of stock of this sort, without any notice of its non-payment, would be protected. So far as proof of the non-payment is concerned, the evidence is positive and really uncontradicted that nothing had been paid upon the stock held by the defendants in the case; and so far as knowledge of this fact by the bank, when it took a transfer of this stock, is concerned, the evidence is uncontradicted that it knew this fact through its president, J. King, he, in making the transfers, dealing with himself as president and authorized agent of the bank to enter into such transactions for it. This stock was subsequently held by the bank. It appears from the record that it availed itself of the privileges of this ownership by being represented through another president, whom it seems succeeded King in the office, at a meeting of the stockholders of this company. It no doubt, when it received the stock, considered it valuable, and that the company would conduct a prosperous business. Having so received it, and thus.

realizing all the advantages and interest held by the original stockholder, it also assumed his liabilities growing out of a subscription to that stock, as hereinbefore indicated, and it was chargeable with the knowledge of its agent and president, that the subscription on this stock had never been paid. Therefore the doctrine applicable to innocent purchasers of stock purporting on its face to have been paid can not apply to this case. If a transferee of stock for value receive the same under the impression or belief that the subscription has been fully paid to the company, we do not think this would necessarily relieve him of liability to creditors, if the subscription for the same had not, in point of fact, been paid. By receiving the same he acquires title thereto, becomes a stockholder in the company, entitled to all benefits and advantages growing out of such a possession, and the law also charges him with knowledge of the fact that he receives the stock subject to the same liabilities as the person to whom it was originally issued. For his own protection, then, it would be a natural course, before acting upon such a presumption, to use due diligence in investigating the status of the stock, and whether or not anything was due thereon. Certainly, for any failure to do so, or any laches on his part in making such investigation, a creditor, who had nothing to do with the transfer, or creating a wrong impression upon the transferee's mind, should not suffer. This principle seems to be recognized in Upton v. Tribilcock, 91 U. S. 45. It was there decided: "Representations by the agent of a corporation as to the non-assessability of its stock, beyond a certain percentage of its value, constitute no defence to an action against the holder of the stock to enforce payment of the entire amount subscribed, where he has failed to use due diligence to ascertain the truth or falsity of such representations. The word 'non-assessable' upon the certificate of stock does not cancel or impair the obligation to pay the amount due upon the shares created by the acceptance and holding of such certificate. At most, its legal effect is a stipulation against liability from further assessment or taxation after the entire subscription of one hundred per cent. shall have been paid." If that principle applies to one as an original subscriber to stock in a corporation

who makes a trade or contract with the governing powers of the corporation, by which he is assured he will not be called on except for a certain percentage of his subscription, we do not see why it would not with equal force apply to a transferee from an original subscriber, and why such transferee would not be called upon to exercise due diligence in making inquiry as to the payment of the stock, even where representation has been made to him that it has been paid.

It is further contended by counsel for defendants, that this record shows no notice to the bank charging it with a knowledge of the non-payment of this stock when it received the same as transferee and owner; that the knowledge of King, its president, was not chargeable to the bank, for the reason that King, in this transfer, was acting in his own interest, which was antagonistic to that of the bank. This is really the vital question in this case, and the writer confesses, in the patient investigation he has endeavored to give it, that its correct solution is not without difficulty. We recognize the principle that when stock of this character passes into the hands of a transferee, who occupies the position of an innocent purchaser for value, and who accepts the same on the faith of a stipulation printed on the certificate of stock issued to him that the same has been fully paid up and is non-assessable, has no notice to the contrary, and could not have ascertained the contrary by the exercise of ordinary diligence, he could not be held liable, even upon a suit by a creditor for an unpaid balance due on the subscription by the original sub-scriber. We recognize further that there is authority of weight from distinguished law-writers on this subject, which does not seem to impose the duty upon the transferee of stock, containing upon its face indications of its being fully paid up, of institut-ing further investigation to determine whether or not this is the truth, and that when he is sought to be held liable by a creditor, the burden of proving the stock was not paid up, and that the transferee had notice of this fact, is upon the creditor. Accord-ingly it is stated in 3 Thompson on Corporations, § 2934: "Where a corporation issues shares as paid up, treats them as such, and, as such, puts them on the market, a person who inno-cently purchases them under the belief that they are paid up will

not become chargeable with a liability to the creditors of the corporation in case the representations of the company should turn out to be false." In section 3716 the author further places the burden of proof on the creditor to show the purchaser had notice of such false representation when he bought. We also recognize some exceptions, sustained by authority of weight, to the general rule which imputes the knowledge of an agent or officer of a corporation, acquired by virtue of his employment as such, about matters relating to his employment and over which he has supervision as the agent or officer for the company, as the knowledge of the corporation itself. A general exception to this rule is that it usually has no application where the agent is acting for himself in his own interests, and adversely to that of his principal. In 4 Thompson on Corporations, § 5206, it is substantially declared, that where a corporate officer acts avowedly for himself in a transaction with the corporation, he is regarded as a stranger to the corporation, and any uncommunicated knowledge he may have in respect of the transaction will not be imputed to the corporation. To charge notice on the corporation in such cases, affirmative evidence must be given that the officer has made disclosure thereof to other and disinterested officers of the corporation, whose knowledge may properly be said to be that of the corporation. In applying this rule, we find there is a conflict of authority in adjudications outside of this State by courts of last resort, some of them recognizing that there are exceptions to this general exception upon principles which we think would be applicable to the facts of this case; while there are other decisions which seem to forcibly sustain the contention of counsel for defendants. We have examined several of these authorities, but we deem it unnecessary to consume time and space by comparing them, or criticising the conclusions reached by their authors. Suffice it to say that our conclusions in this case are reached by the recent adjudications of this court in its decision of principles which we think not only are in entire accord with the view herein entertained, but under which we feel bound.

In the case of *Brobston* v. *Penniman*, 97 *Ga.* 527, it appears that the president and cashier of a bank were also members of a

partnership composed of themselves and another person, to the capital stock of which they had, under partnership articles, agreed to contribute a given sum. Without the knowledge or consent of the other person, who was a member of the partnership, this president and cashier executed and delivered to the bank a promissory note, in the name of the partnership, for the purpose of raising the money they had so agreed to put in the partnership business. The transaction was evidently for the private benefit alone of the two members of the partnership, who were the president and cashier of the bank. It was in no sense for the benefit of the partnership itself, nor could it have been for the benefit of the bank. In that case this court, by a unanimous decision, held, that the knowledge of the president and cashier of the facts above given was the knowledge of the bank itself, and neither the partnership as such, nor the remaining member, was liable to the bank upon the note in question. Following this decision is an able opinion by Justice Lumpkin, now Presiding Justice, in which he cites several authorities to sustain the principle upon which the decision is based. Unquestionably, to our minds, the president and cashier of the bank in that case were as much interested for themselves individually in the transaction they were negotiating with the bank as was Mr. King in this case, when, as president of the bank, he received a transfer of the stocks and bonds of the Rome Electric Light Company to the bank. This principle has been followed by a more recent decision of this court in the case of *Morris* v. *Banking Co.*, 109 *Ga.* 12. It was there decided: "Where an individual has an interest in a promissory note which he knows was given without consideration, and such individual as cashier of a bank, having full authority and control of the discounts of the bank without reference to or consultation with any other officer of the bank, discounts such note with the funds of the bank, the latter is not a bona fide purchaser of the note, without notice. If it ratifies the act of its officer and claims title to the note, it must take it subject to the knowledge which the officer who discounted it had at the time." It appears in that case then that this cashier was interested individually in the note, and it presents, to say

the least of it, certainly a strong case to show that when he cashed this note out of the funds of the bank he was acting as much in his individual interest as was the president of the bank in the case at bar when he transferred his stock to the defendant bank in this suit. We call special attention to the able opinion written by Mr. Justice Little in that case. In the course of that opinion reference is made to many adjudicated cases which seemingly support the contention of the defendants as to the exception to the general rule under which they claim that the banking company was entitled to hold the note of Ragland free from any implied notice of Cassin's fraud, if such there were. But a distinction was drawn in these cases between the exception and the rule. It was conceded in that opinion to be a sound proposition of law, that where an officer or agent of a corporation, as the party at interest, for himself deals with the corporation, the latter is not charged with notice of the information possessed by such officer or agent so dealing, but it is because in such a transaction the assumed agent is in reality the adverse party, and is not to be treated in so dealing as an agent of the corporation at all. But it was further observed in that opinion, "and many, if not a majority, of the cases which announce the doctrine that, when the agent has an interest in the transaction which would be prejudiced by the disclosure of the information, the presumption of its communication does not prevail, will be found to be where the agent or officer acts in his individual capacity, and treats with some other officer or agent of the corporation." It was accordingly held that the principle involved in the cases referred to does not apply to a case where one party, having knowledge of the invalidity of the paper of which he is the individual owner, discounts it in a corporation of which he is the duly authorized agent, and is himself the only actor for the corporation. A number of authorities are cited in that opinion, which, of course, we do not deem it necessary to repeat in this connection. There is no pretence that King, as president of the bank, was not fully charged with the duties and powers exercised by him in his official capacity in the negotiations with reference to this particular stock. The decision of this court in the case of *Savannah Bank & Trust Co.* v. *Hartridge,*

73 *Ga.* 223, considered in the light of its facts, is not out of harmony with what is above laid down.    It is true that the cashier of the bank took from Hartridge the note upon which its action against him was based, but it also appears that this very note was executed in pursuance of a contract or arrangement between the cashier and Hartridge which was in violation of the rules of the bank, and that Hartridge knew it.    He aided the bank's officer in doing an improper and unlawful act, and on this state of facts it was held that the bank was not bound by the contract between the cashier and Hartridge, unless it had notice of the same and authorized it, or in some way ratified it, and that it was not bound by the knowledge and ratification of the cashier alone.    The effect of the ruling was, that under these peculiar circumstances the bank was not so bound or concluded by the knowledge and conduct of its cashier as to be cut off from its remedy against Hartridge on the note.    To have held otherwise would have been to allow him to take advantage of his own wrong.    He was certainly in no position to set up against the bank a defense the maintenance of which would have led to just this result.    The decision against Hartridge can safely rest upon this idea, and the language used in the headnotes and opinion should be interpreted and understood with reference to the facts then before the court.    It should not be given universal application, or be regarded as authority binding upon the court in a case like the present, which differs so widely from that in which this language was used.    This transaction was ratified by the bank, in its retaining the stock, having the same entered on the books, and its name enrolled upon the books of the company in which the stock was held, as one of its stockholders, and in availing itself of the privileges of such a stockholder.    We do not see how it could claim the advantages and privileges of this possession and ownership without becoming chargeable with notice of the burdens it had likewise assumed, of which it had knowledge, through its president, when it thus became the owner of this property. We think, therefore, the court clearly erred in granting a nonsuit as to the bank.

4. We think granting the nonsuit as to the defendant Arm-

stead is apparently better supported than it is as to the bank. It does not appear from the testimony when or how he became a stockholder; whether he was an original subscriber, or a transferee from an original subscriber. No certificate of his stock was introduced, and it does not appear from the testimony that his certificate had the words thereon indicating that the same had been fully paid up. It does appear, however, that he was a stockholder from February, 1896, until May 22, 1897, which contradicts the impression sought to be conveyed by his answer as to when the services of plaintiffs were rendered the company; and plaintiffs having shown he was a stockholder in May, 1897, would not this be enough to raise the presumption, in the absence of anything to the contrary, that he is still a stockholder? It is true that Armstead may have a valid defense, if he is able to satisfactorily prove that he was an innocent purchaser without notice of non-payment of·this stock; but, under the facts in this record, we do not think the court should raise such a presumption in his favor, and the judgment granting a nonsuit as to both defendants should be reversed.

5. The defendants filed a cross-bill of exceptions in this case, in which exception is taken to the ruling of the court in admitting, over objection of defendants' counsel, testimony of those parts of the minutes of the Rome Electric Light Company which appear on pages 34 and 35 of said minutes in regard to the subscription and payment of the stock. The ground of said objection was, that the evidence offered was not a full statement of the minutes on these subjects of subscription and payment, but was a part only, pointing out that other parts of· the minutes, especially pages 1 and 6, were parts of the same transaction, and should be introduced with the portions offered. This court has in several cases recognized the right of a party litigant to introduce only a portion of a record in his case, when it is distinctly specified what part is offered. That was done in this case. *Jones* v. *Grantham*, 80 *Ga*. 472; *Henderson* v. *Francis*, 75 *Ga*. 178; *Dowling* v. *Feeley*, 72 *Ga*. 559-567. In the last case cited it was held that " where a plaintiff offered in evidence an incomplete return of an administrator as an admission, and it had folded in it various receipts, accounts, etc., referred to

as vouchers, he was not compelled to put them in evidence along with the returns. That was the right of the defendants, if they could show that the enclosed were either a part of the admission or connected therewith." Refusing to compel the plaintiffs in this case to introduce other portions of the minutes insisted on by defendants' counsel could not have affected them injuriously, for the reason that they had the privilege of introducing such other portions if they threw any light upon the issue under investigation.

6. It was further objected in the cross-bill that the court erred in permitting, over objection of defendants' counsel, the witness J. King to answer the following question propounded by plaintiffs' counsel: "I see here, Mr. King, the subscription made by J. S. Lawrence, to be paid by first mortgage bonds of the Rome Street Railroad Company, of the par value of $25,000.00. Did the company ever get these bonds?" Defendants objected on the ground that all this matter was in writing, and called the court's attention to the minutes on page 6, to the receipt of J. S. Lawrence for 478 shares of stock, and some other entries upon the minutes throwing light upon the transaction. It does not make any difference what the minutes of this company show. This witness was asked a question upon his personal knowledge, and claimed to have personally known the facts about which he testified, without reference to any memoranda or record copied in the books of the company. There was no error for the court to admit this testimony.

*Judgment on main bill of exceptions reversed; on cross-bill affirmed. All concurring, except Fish, J., absent.*