## Jacob Reese and William Fisher vs. The Bank of Commerce.

The charter of a bank provided that its shares of stock "shall be transferable on the books of the corporation only, according to such rules as shall be established by the President and Directors, but all *debts actually due and payable* to the corporation, by a stockholder requesting a transfer, *must be satisfied before such transfer shall be made*, unless the President and Directors shall direct to the contrary. Held:

1st. That this *lien* on the stock is not *waived* by the form of a certificate for stock declaring that the stockholder "is entitled" to —— shares of stock "transferable only at said bank, personally or by attorney, on surrender of this certificate."

2nd. The assignee of a stockholder takes his equitable assignment, subject to the rights of the bank, against the stockholder, under its charter, of which he is bound to take notice.

3rd. This lien attaches to balances due the bank by the stockholder, for *overdrafts on checks*, but not to notes or bills on which the stockholder may be a party, as maker or endorser, *not due* at the time the transfer is demanded.

4th. The words, "debts actually due and payable," imply more than mere indebtedness; the indebtedness contemplated is only a *debitum solvendum in presenti*, not *in futuro*.

5th. Where an assignee demands a transfer, but refuses to pay the debts *then* due the bank by the stockholder, and afterwards makes a *second* demand when other notes of the stockholder had become due and payable, he cannot obtain a transfer without paying all the debts due at the time of the last demand.

It is no objection to a decree for the sale of stock, to pay debts due by a stockholder to the bank, that it did not give the defendants a day within which to pay the same; the Act of 1785, ch. 72, sec. 3, has no application to such a case.

Appeal from the Circuit Court for Baltimore City.

The bill in this case, filed on the 17th of November 1855, by the Bank of Commerce against the appellants, alleges that Francis M. and Henry F. Baughman were owners of sixty, and Jacob F. Kridler of thirty-two, shares of its capital stock; that the defendant, Fisher, on the 4th of December 1854, presented to the cashier of the bank a power of attorney from the Baughmans, accompanied by the certificate for the stock for the transfer to the defendant, Reese, of forty shares of

stock, but the bank declined to allow the transfer to be made until a debt of the Baughmans, of $830.44, due the bank, was first paid; that Fisher, on the same day, also presented a power of attorney from Kridler, for the transfer to Fisher of thirty-two shares of stock, standing in the name of Kridler, but the bank also declined to allow this transfer to be made until a debt of $277.48, due by Kridler to the bank, was first paid, and that Fisher refused or neglected to pay either of these sums. The bill further charges that, since the 4th of December 1854, the Baughmans have become further indebted to the bank, upon paper discounted prior to that date, in the sum of $1130.44, making their entire indebtedness, now due the bank, $1960.88, and that Kridler, since that date, has also become further indebted to the bank, upon paper discounted prior to that day, in the sum of $400, making his entire indebtedness, now due the bank, $677.48. The bill then alleges that the bank, by its charter, has a lien upon the stock of the Baughmans and Kridler for the payment of the amounts now due by them respectively, and prays that a decree may be passed for a sale of this stock for payment of the amounts so claimed.

The defendants, in their answer, admit that Fisher, acting as agent for Reese, presented to the bank the respective powers of attorney and certificates mentioned in the bill, and that the bank, through its officers, refused to permit the transfers to be made until the debts alleged in the bill to be due by the Baughmans and Kridler, respectively, were first paid, and that such transfers have never yet been made. They then state that these powers were executed by the Baughmans and Kridler, respectively, on the 27th of September and the 23rd of October 1854, and, with the accompanying certificates, were delivered to Fisher, as agent of Reese, as collateral security for two notes of the Baughmans and Kridler, respectively, of $700 and $500, discounted on those days by Reese, which notes are now due and wholly unpaid and unsecured except by these powers and certificates. They further state that on the 4th of December 1854, whilst so refusing to permit the transfers to be made, the officers of the bank declared that the

Reese & Fisher *vs.* The Bank of Commerce.

bank held sundry collaterals in its hands, out of which, or some of which, as suggested by them, the respective accounts of these parties would probably be made good to the bank, and the then president of the bank advised that matters should be permitted to remain in their then condition for the time being, until it should be ascertained what might or would be realized by the bank from such collaterals, and that Fisher acquiesced in the course so advised, and, for a period of some months, nothing further was said or done in the premises; that afterwards, and shortly before this bill was filed, Fisher again called and desired the transfers to be made, when the bank again refused, unless the full augmented amounts of the alleged respective debts of the Baughmans and Kridler to the bank, were first paid, and as the sums, then demanded, greatly exceeded, in each case, the value of the stock embraced in each certificate, payment thereof was declined and refused by the respondents. Fisher, answering for himself, says that if, upon investigation, he had found the asserted indebtedness of Kridler to be, as alleged on the 4th of December, he would undoubtedly have paid it on that day, and procured a transfer of the thirty-two shares, inasmuch as the value of the stock exceeded the alleged debt, but, in consequence of the aforesaid statement that the bank held sundry collaterals, he forebore to make any investigation, at that time, into the alleged indebtedness of either of these stockholders, and readily acquiesced in the advice of the then president of the bank, as being judicious and expedient, and so acquiesced, in confidence, that such representations were, in all respects, true. The answer does not admit the alleged indebtedness of the Baughmans or Kridler, and does not concede that the bank, according to the tenor and effect of these certificates, has any such lien, as claimed in the bill. It further states that, at the time these powers and certificates were received, they were accepted in good faith, without notice of any indebtedness of the respective stockholders to the bank, and without notice of the dealings or transactions of them, or either of them, with the bank; that, when the application was made for the transfers, on the 4th of December 1854, no notice or intimation was given or made to either of

the respondents, that the alleged indebtedness of either of these parties would, or might be, augmented by, or in consequence of, any other dealings and transactions of either of them with the bank; but, on the contrary, the suggestion was, that collaterals were held by the bank, out of which, as suggested, the bank would probably realize funds to extinguish or diminish the asserted claims of the bank against both of these stockholders, and respondents are advised that even if the alleged lien of the bank is good in law, as to the amounts really due when the transfers were applied for, still the subsequently accruing indebtedness of these parties, even if shown to exist, cannot be validly claimed as against the respondent, Reese, first, because the right of lien is limited to what was then due when the transfers were applied for, and, secondly, because even if the law be otherwise, under other circumstances, yet the statement and declaration aforesaid, and the absence of notice of the material fact, that, by delay, the indebtedness of these stockholders might become augmented, would debar the bank from enforcing such lien.

The cashier and book-keeper of the bank were examined as witnesses, and proved that on the 4th of December 1854, the Baughmans were liable to the bank for $830.44, on account of repeated previous over-drafts, by checks, and that Kridler, on that day, was liable to the bank for 277.48, also, on account of such over-drafts; that the bank, at that time, kept no tickler or other book, to show the state of the accounts of its customers; the books were probably a month behind; when a party over checked, and the fact became known to the book-keeper, it was reported to the president or cashier, and the latter says he thinks the fact that these parties had overchecked, was reported to him several times. The additional claim against the Baughmans arises from a note of Edward Wools, for $350, by them endorsed, and discounted for their benefit. This note, dated the 13th of October 1854, at four months, became due on the 16th of February 1855. The additional claim against Kridler, arises upon his note for $400, endorsed by the Baughmans and discounted by the bank. This note, dated the 11th of October 1854, at three months,

became due on the 14th of January 1855, and is, also, by the bill, made a claim against the Baughmans. The cashier also proves that the application for the transfers, on the 4th of December 1854, was not made by Fisher, but by some one in his behalf, and that witness declined transferring the stock on account of the indebtedness of the Baughmans and Kridler to the bank; he did not state the amount of such indebtedness to the person making the application; that question was not asked him; at the time this application was made, the bank held no collaterals of either of the holders of the stock, and witness did not make any statement to that effect to the person applying for the transfer; the application was made to the transfer clerk in the first instance, who referred the person making it to witness; the refusal to transfer was absolute—there was no condition; just before the institution of this suit, an offer was made to pay Kridler's debt, of $277.48 and interest, but witness declined to make the transfer.

The powers of attorney to transfer the stock were in blank, and the certificates for the stock are signed by the president and cashier, and under the corporate seal of the bank, and are in this form:

"*Be it known,* that F. M. & H. F. Baughman *are entitled* to forty shares in the capital stock of the Bank of Commerce, *transferable only at said bank, personally or by attorney, on surrender of this certificate.* Witness, the seal of the President, Directors & Co., of the said Bank of Commerce, this fourteenth day of July 1854."

By its charter, (Act of 1854, ch. 235,) it is provided that the aforesaid bank " shall be entitled to all the rights, powers and privileges, and be subject to all the duties, restrictions, limitations and conditions of the several banks comprehended in the Act of 1853, ch. 441, entitled " an Act to continue the corporate existence of the several banking institutions therein mentioned." The provision of this latter Act, in relation to the tranfer of stock, is the 16th Art. of sec. 4, as follows:

"*Art* 16. That the shares of the capital stock of the corporation shall be transferable on the books of the corporation only,

according to such rules as shall be established by the president and directors, but *all debts actually due and payable* to the corporation by a stockholder requesting a transfer, *must be satisfied before such a transfer shall be made,* unless the president and directors shall direct to the contrary."

The court (KREBS, J.) passed a decree that the stock mentioned in the proceedings, "be sold to pay the several claims against said stock, of the complainant," and appointed a trustee to make the sale, on ten days' notice, "for cash," and that the stock should be transferred to the purchaser, "free, clear, and discharged of all claims of the parties." From this decree the defendants appealed.

The cause was argued before LE GRAND, C. J., TUCK and BARTOL, J.

*Wm. Fisher* and *Wm. Schley,* for the appellants, argued:

1st. Even if a bank, which had not waived the right, could validly claim a lien, under the 16th Art., of sec. 4, of the Act of 1853, ch. 441, for debts actually due and payable by a stockholder, requesting a transfer of stock, yet this bank, by the exigency and tenor of its *certificate* for this stock, had effectually *waived* this right. This law says, such debts shall be satisfied before a transfer is made, "unless the President and Directors shall direct to the contrary." The bank has, therefore, the power to *waive* any such indebtedness, and may *antecedently* waive this lien, if it chooses so to do, and this, we insist, it did by this certificate. The certificate is evidence of the ownership of the stock; it says the parties *"are entitled"* to so many shares of stock, *"transferable only at said bank, personally or by attorney, on surrender of this certificate."* The only *conditions* of the transfer here prescribed are, that it shall be done at the bank, and the certificate delivered up, and by prescribing these as the only conditions the bank has *waived* the lien secured to it by its charter for all time to come. It is to be observed, also, that the bank here comes as *complainant,* and asserts the lien against a *bona fide* purchaser without notice, and, therefore, this case differs materially from

one where the bank is a *defendant,* and in its answer swears that the form of the certificate was not intended as a waiver of the lien, as was the case in 2 *Wheat.,* 390. It may be that as between the bank and the stockholder the lien is not waived, but a *bona fide* assignee, without notice, stands in a different position, and this court would establish a wholesome rule by declaring banks should not put forth certificates of this kind —representations which are not true on their face—and hold them to the strict letter of such papers. We therefore rely, in support of this proposition, upon the maxim, *"Unusquisque potest renunciare juri pro se introducto,"* and upon the doctrine, that a *bona fide* purchaser for value, without notice, is not bound by a secret extrinsic equity; and the further doctrine, that a party making a representation, on the basis of which another has acted, is bound, by *estoppel in pais,* not to claim against his representation; and also upon the maxim, *"Expressio unius est exclusio alterius,"* and the following authorities: 7 *G. & J.,* 310, *Hodges vs. Planters Bank.* 5 *Gill,* 499, *Hall vs. United States Ins. Co.* 8 *Pick.,* 90, *Sargent vs. Franklin Ins. Co.* 15 *Sergt. & Rawle,* 143, *Grant vs. Mechanics Bank.* 17 *Sergt. & Rawle,* 286, *Sewall vs. Lancaster Bank.* 5 *Barr.,* 348, *Presbyterian Congregation vs. Carlisle Bank.* 1 *Cromp. & Mees.,* 808, *Roberts vs. Barker.*

2nd. But if the lien existed and was not waived, still this law was not intended to embrace a claim for an overdraft by a customer, knowingly permitted or negligently allowed to be made. A claim of this character is not *"a debt"* actually due and payable to the bank by the stockholder, within the meaning and policy of the law. An overdraft is not a *debt* but a *tort*—a violation of duty—and it was not within the authority of the bank's officer to let the party have the money. If a stranger had come with the check and got the money, it would have been the bank's money obtained *against its will,* and it could recover the same from the party so obtaining it. 3 *Gill,* 96, *Merchants Bank vs. Marine Bank.* The act of elect to call it a debt, let it adopt the contract in its entirety, the cashier in paying was a *tort,* and if the bank chooses to and call it money loaned without security. It must be a *debt*

which, in the ordinary acceptation of the term, arises from *contract*, and such a *tort* as this cannot be called a contract, or elected so to be, except by the knowledge and consent of the stockholder. The remedy of the bank was against the officer on his bond. On this point see 7 *H. & J.*, 381, *Eichelberger vs. Finley;* 7 *G. & J.*, 138, *Union Bank vs. Cochran;* 1 *Pet.*, 46, *Minor vs. Mechanics Bank of Alexandria; Grant on Banking*, 27, in 93 *Law Lib.; Miller on Mortgages*, 26, in 47 *Law Lib.; Cross on Lien*, 45, in 34 *Law Lib.;* 7 *H. & J.*, 320, *Kemp vs. McPherson*, and *Merchants Bank of Balto. vs. The Farmers Bank of Virginia*, stated in 10 *Md. Rep.*, 124.

3rd. If our first and second points be well taken, it follows as a consequence, that the refusal of the bank to allow the transfer, on the 4th of December 1854, was unwarranted and unlawful. The presentation of the power, and the possession of the certificate, and offer to surrender it to the bank, fixed the right of Reese to the stock in equity. 1 *Ves. Jr.*, 281, *Yeates vs. Groves.* The Baughmans were merely endorsers on the notes of Wools and of Kridler, and were, therefore, only contingently liable. It cannot be said that this contingent liability constituted, in either case, a debt, "*actually due and payable,*" to the bank by the Baughmans. Due demand, non-payment by the makers, and notice, were necessary to fix their liability. Besides this, neither note was due and payable at that time. The words, "actually due and payable," mean something more than mere indebtedness; they import an *immediate right of action.* Kridler was, undoubtedly, indebted to the bank, on the 4th of December 1854, upon the note which became due on the 14th of January 1855, but his debt was not then *actualty due and payable.* It was, "*debitum in presenti solvendum in futuro.*" The right to refuse to allow a transfer does not exist in relation to *any* and every debt, but *only* in relation to a debt *actually due and payable.* On this point, see 2 *Peere Wms.*, 207, *Child vs. Hudson Bay Co.;* 5 *Gill*, 499, *Hall vs. United States Ins. Co.;* 15 *Sergt. & Rawle*, 143, *Grant vs. Mechanics' Bank;* 3 *How.*, 483, *Black vs. Zacharie.*

Reese & Fisher vs. The Bank of Commerce.

4th. But, even if the amount of the over-drafts can be considered as a debt " actually due and payable," still the right of Reese was fixed on the 4th of December 1854, and his neglect to pay the amounts claimed, did not impair his equitable right. Immediate payment was not a condition precedent to the accrual of his right in equity to the stock subject to the lien of the bank. Whether he paid, or whether the bank enforced payment to the *extent* of its lien, was precisely the same, that is, the amount of the lien, as it existed on that day, and interest thereon until paid. This decree, however, enforced the lien for the whole amount claimed by the bank against both parties, including the notes which became due after the bank had full notice of the equitable title of Reese.

5th. The decree in directing a sale of the stock, without affording the defendants an opportunity to pay the lien, and without affording a reasonable time to do so, was contrary to the practice of a court of equity in cases of this description. 2 *H. & G.*, 96, *David vs. Grahame.* 2 *Danl. Ch. Pr.*, 1204. 12 *Md. Rep.*, 283, *Porter vs. Timanus.*

6th. The decree was clearly wrong, in allowing the *claims* of the bank against the stock, as the bank claimed against the Baughmans an amount which *included* Kridler's note for $400, and the claim against Kridler also included the same note.

*Jas. Malcolm* and *Geo. Wm. Brown,* for the appellee, argued:

1st. That the bank had a lien by its charter on this stock for the debts due by the stockholders respectively at the time of the application of Reese on the 4th of December 1854, for the transfer, and neither the appellants nor the stockholders having paid or offered to pay the amount then due by such stockholders, and not having subsequently paid or offered to pay the same, and having made no subsequent application for a transfer to time of filing this bill nor before decree, the bank was entitled to have the stock sold to pay the *whole* existing indebtedness for which the same was liable at the time the bill was filed. The lien thus given is a statutory lien on

the stock. But it is said the *form* of the certificate is a *waiver* of this lien. This is not so. The bank had no right to make a *general waiver* even if it has done so. It may do so in particular cases for special reasons, but this certificate is not such a case of waiver, and this was expressly decided in *Farmers Bank vs. Iglehart,* 6 *Gill,* 56. See also on this point 2 *Wheat* 390, *Union Bank vs. Laird;* 10 *Pet.,* 596, *Brent vs. The Bank of Washington;* 22 *Wend.,* 362, *Commercial Bank of Buffalo vs. Kortright;* 12 *Sergt. & Rawle,* 77, *Rogers vs. The Huntingdon Bank;* 2 *Wels., Hurls. & Gor.,* 740, *Hague vs. Dandeson;* 3 *Kernan,* 599, *Mechanics Bank vs. New York & New Haven Rail Road Co.*

2nd. That at the time of the application for the transfer on the 4th of December 1854, the amounts claimed by the bank, *was a debt actually due and payable,* and the appellants having neglected or refused to pay the amount of the then existing indebtedness, they subjected the stock to the other claims then running to maturity. The cases already cited under the first point fully establish the position that an overdraft is a *debt.* On this point see also 3 *Strob.,* 403, *Bank of St. Mary's vs. Calder;* 2 *Hill, (N. Y. Rep.,)* 220, *Denny vs. Manhattan Co.*

3rd. That the appellants cannot rely upon the application for a transfer made on the 4th of December 1854, nor was the bank bound to allow it upon such application, as the power of attorney upon which the application rested was *in blank,* and no person named therein as attorney or assignee. 11 *Barb.,* 580, *Dunn vs. Commercial Bank of Buffalo.*

4th. That the decree is not erroneous in directing a sale of the stock without giving a day for the appellants to pay the liens thereon. The Act of 1785, ch. 72, sec. 3, does not apply to cases of sales of personal property.

TUCK, J., delivered the opinion of this court.

It is not denied, on the part of the appellants, that the bank has a lien on stock for the payment of debts of stockholders; but it is insisted, 1st, that the lien in this case was waived by the form of the certificate: and 2nd. that if not

waived, the lien does not attach to balances due for overdrafts on checks, nor to notes or bills on which the stockholder may be a party as maker or indorser, not due at the time the transfer may be demanded.

The first of these positions must be determined against the appellants upon the authority of *Farmers Bank of Md. vs. Iglehart*, 6 *Gill*, 50. That charter provides, that, "all debts actually due to the company by a stockholder offering to transfer, must be discharged before such transfer shall be made." It was held that the power to withhold the transfer could not be questioned, and that the predicament of Iglehart was precisely that of the stockholder under whom he claimed. "For dealing with a stockholder of the company in reference to his stock, he is held to have taken his equitable assignment subject to the rights of the bank, under the Act of incorporation, of which he was bound to take notice." The same doctrine had been established in the cases of *Union Bank vs. Laird*, 2 *Wheat.*, 393. *Brent vs. Bank of Wash.*, 10 *Peters*, 616, where the bank charters provided that, "all debts actually due and payable to the bank, (days of grace for payment being passed,") should be satisfied before the transfer could be made, unless the president and directors should direct to the contrary. As the debts alleged against the stockholders were overdue, no question was made as to the phraseology of the clause under which the transfer was resisted. The charter of the present appellee, provides for the payment, before the transfer, of " all debts, actually due and payable, to the corporation." The first proposition of the appellants must be taken as covered by the decisions referred to, because, if the form of the certificates had been deemed as a waiver of the lien, the claims of those banks could not have been enforced. They are substantially the same with the one before us, as far as concerns the present question, and should receive the same interpretation. The 16th Article looks to an express waiver by the president and directors, and, although in 7 *Gill & Johns.*, 310, *Hodges vs. Planters Bank*, the court held that the privilege might be waived, there was no intimation that the certificate had

36    v. 14.

such effect, notwithstanding the charter of the bank—Act of 1817, ch. 16—contained a similar provision.

We do not concur with the appellants, that this lien cannot be asserted against stock for balances due by the owners for over-checks. As far as the defence may rest on want of notice on the part of the assignee, it can make no difference to him how the indebtedness may have arisen—whether by over-drafts or as maker or endorser of notes, because the same means of information are open to him in either aspect of the transaction. His condition, at the time of the assignment, would be the same. He is presumed to have taken his equitable assignment, subject to the rights of the bank against the stockholder, of which he is bound to take notice. The certificate furnishes no information what these rights may be; his reliance must be on application at the bank, and if he proceeds in ignorance, it is his own fault. Can it be said that a customer whose checks are honored at the counter, is not indebted to the bank for amounts so overdrawn? It may be done inadvertently, or to save the credit of the drawer, when it becomes a debt of the highest degree, though not entitled to greater respect in the courts. The charter speaks in general terms of "all debts actually due and payable." Over-payments on checks are due and payable immediately, and as much within the protection of the charter, as being secured by the stock, as if they originate in any other way. It is true, that a bank officer cannot pay over-checks without committing a breach of duty, for which his official bond may be liable. *Minor vs. Mechanics Bank of Alexandria*, 1 *Peters*, 46; but that is not the only remedy. In the very case mentioned by the counsel, *Merchants Bank of Balto. vs. The Farmers Bank of Va.*, not reported, but set out in the case of *Boyd vs. McCann*, 10 *Md. Rep.*, 124, the holder of a check, endorsed "good," by the cashier, when the drawer had no funds to his credit, recovered against the bank on which the check was drawn. The unauthorized act of the officer was not allowed to prejudice an innocent party. Can it be possible that whilst the bank is liable to pay the check, and has a remedy over against the officer, the party benefitted

may escape? Such a transaction does not belong to the class in which a corporation seeks to recover on a contract not authorized by its charter; it does not rest on contract at all, but on the principle, that the person charged is in possession of funds or property of another, which should be surrendered or returned to the true owner.

But we are of opinion that the lien did not attach to paper not due at the time the transfer was demanded. The words are, "debts actually due and payable to the corporation." They imply more than mere indebtedness, and it has been so decided in a similar case. By the 9th sec. of the charter of the United States Insurance Company, it is declared, "No stockholder, indebted to the company, shall be permitted to make a transfer or receive a dividend, until such debt be paid or secured." In *Hall vs. U. S. Ins. Co.*, 5 *Gill*, 499, it was held that "instalments, not called in, constituted no such indebtedness as was contemplated by the Act of Assembly. It contemplated only a *debitum solvendum in presenti*, not *in futuro*." There the words might have embraced any indebtedness; here they are restricted to "debts actually due and payable." We think that the language admits of no other construction. It is true, that in the case of *Brent vs. Bank of Washington*, 10 *Peters*, the court said that "the signature of a party to a note is an inchoate pledge of his stock for security; his stock gives credit to his name, and the bank grants the loan on its faith;" but that was a controversy between the bank and the United States, in fact, claiming priority under an Act of Congress, the deed of trust which covered the stock having become inoperative by non-acceptance by the trustees, and did not involve any question between the bank and parties, as here, claiming under an assignment executed before the note became due. It was held, that as between the bank and the government, the equitable lien of the former should prevail.

This view, however, cannot aid the appellants, because they did not pay what the bank had a right to demand at the time the certificates were first presented for a transfer of the stock;

and when a second demand was made, other notes of the stockholders had become due and payable, which the assignees declined paying. The words in which this privilege is given, are plain, and admit of no doubt; they are obligatory, and require payment before the transfer can be made, except, of course, in those cases where the privilege is waived, and here there is no such waiver. The stock stood as security for the debts, and the assignee could not demand a transfer of the stock, which would be a surrender of the security before the corporation was satisfied. It was not then satisfied, and had not been when the bill was filed to enforce the lien. And it is not until the bank is seeking to avail itself of the security, that the appellants are willing to submit to the terms of the charter. We are not prepared to say that, if they had, before the other notes became due, offered to redeem the stock, by paying the indebtedness up to the 4th of December, they would not have been allowed to do so; but they cannot, after the charge upon the stock has been increased by the falling due of other paper, claim to be remitted to their condition on the 4th of December. The stock must stand pledged for all the indebtedness due at the time the last demand for transfer was made.

There was no obligation on the court to have given the defendants a day to pay the debts. The Act of 1785, ch. 72, sec. 3, has no application. It was within the discretion of the court to prescribe the terms of the sale, and the assignees might have paid the claim at any time after the decree. Actual sales of stock are usually made for cash, and when these shares became forfeited, there was no right in the debtors, or those claiming the stock, to have a day appointed, within which it might be redeemed.

The objection that the decree allowed the *claims* of the bank, when the bill had claimed the same sum twice, is of little importance, and does not entitle the defendants to a reversal, since the Act of 1832, ch. 302.

As part of the debt was due, the decree should be allowed to stand. In sending the cause back, the court can protect the parties against a sale for more than is necessary to pay

the sums due, or the decree may be reformed, or, if a sale has been made, pending the appeal, injustice may be prevented by stating the accounts of the trust in accordance with the opinion of the court above. To this end the cause will be remanded without affirming or reversing the decree.

*Cause remanded.*

(Decided July 15th, 1859.)