## PEOPLES BANK OF TALBOTTON *v.* EXCHANGE BANK OF MACON.

1. A bank the charter of which provides that the total liability to it of any person "for borrowed money . . shall at no time exceed one-tenth part of the capital stock of said bank paid in," and also that the stock of any stockholder in such bank "shall be held bound to the bank for any dues or other indebtedness by said stockholder to the bank," and it shall have a lien "upon the same superior to all other liens," has, by virtue of its charter, a lien of the highest dignity upon the stock of a stockholder to an amount not exceeding ten per cent. of the capital stock of the bank actually paid in, notwithstanding it may have violated the terms of its charter by loaning to such stockholder a sum largely in excess of that which it was thereby authorized to permit him to borrow.

2. Where the charter of the bank further provides that no assignment of stock shall be valid, as against it, unless a formal transfer of the same be made on its books, it is the right of the bank to treat a stockholder as the true owner of stock issued to him, and to deal with him accordingly, until it receives notice that the stockholder has assigned his stock to a third person ; aliter,

after notice is brought home to the bank, even though there has been no attempt on his part to secure a formal transfer of the stock upon its books.

3. A corporation is not to be charged with notice of facts of which its president acquires knowledge while dealing in his private capacity and in his own behalf with third persons; nor is knowledge on his part thus acquired imputable to the corporation when, acting through another official, it deals with him at arm's length as with any other individual representing himself alone.

4. While a bank which has violated its charter by allowing a stockholder to borrow a sum of money larger than that which it was authorized to loan him can not, as against an assignee of such stockholder, assert a lien for a greater amount than that provided for in its charter, yet it is not the right of the assignee, if unwilling to himself pay the amount necessary to discharge the lien, to demand a transfer of the stock on the books of the bank until his assignor has fully paid all of his indebtedness to the bank which was contracted prior to the date it received notice that he had assigned his stock.

(a) In an accounting to determine whether such indebtedness has been fully paid off, the sole inquiry should be whether or not the bank has applied payments made by the assignor as he directed, or, in the absence of any direction on his part, in the manner prescribed by law.

(b) The assignee has no right to insist that payments shall be applied otherwise than as the assignor directed, or that a credit voluntarily given to him by the bank to which he was not entitled shall go to the extinguishment of a debt arising before it received notice that he had assigned his stock, rather than to the discharge of an indebtedness thereafter contracted by him.

Argued June 26,— Decided December 12, 1902.— Rehearing denied January 9, 1903.

Exceptions to auditor's report. Before Judge Butt. Talbot superior court. September 19, 1901.

*Persons & McGehee* and *J. H. Martin*, for plaintiff in error.
*A. L. Miller, Hatcher & Carson*, and *J. J. Bull*, contra.

· FISH, J.　The Exchange Bank of Macon presented to the superior court of Talbot county a petition in which were set forth the following allegations of fact: "On the 10th day of January, 1896, G. H. Estes, who was then and was for some time thereafter the president of" the Peoples Bank of Talbotton, "made and executed to petitioner his two notes for the sum of eight hundred and three and 37/100 dollars, and eight hundred and six and 25/100 dollars, respectively, . . and, for the purpose of securing the payment of the said notes, deposited with petitioner fifteen shares of the capital stock of said defendant bank, after having transferred and assigned said shares to petitioner and giving the necessary power of attorney to have the same transferred upon the books of said defendant bank." Estes subsequently made default in the payment of these notes, and petitioner "demanded of the proper officers of

said defendant bank that it transfer upon its books said fifteen shares of stock to petitioner, as required by the charter and by-laws," but with this demand they refused to comply, assigning as a reason for their refusal that Estes was indebted to the Peoples Bank " in a large sum, and that by the charter of said bank a lien is created on the stock held by any stockholder for any indebtedness due by him which is superior to any lien that may be created thereon." Petitioner " was an innocent purchaser for value of said stock, without notice of any such conditions in said charter, and without notice of any indebtedness of said Estes to said bank; and therefore its title to said stock is superior to the lien claimed by said bank, if any such lien exists." Furthermore, " even if the said G. H. Estes was so indebted to said defendant bank, he has paid to it in money and property a sufficient amount to have discharged said indebtedness in full, and any lien which said bank may have had on said stock has been thereby discharged." At " the time of the creation of the indebtedness of said G. H. Estes to your petitioner, and from that time until the maturity of the debt so created, said defendant bank had allowed the said G. H. Estes to become indebted to it in the sum of twelve thousand dollars, or other large sum, and under the requirements of the charter of said defendant bank no person could become indebted to it in any sum greater than one tenth of the capital stock of said bank; that said capital stock, under the provisions of the charter of said defendant bank, is twenty-nine thousand dollars, and that, by reason of the conditions hereinbefore referred to in said charter, said bank could not allow said Estes or any other person to become indebted to it in any sum more than twenty-nine hundred dollars." The said Estes " has more than repaid to said defendant bank the amount which he was legally entitled to borrow from it, or had become indebted to it; and by reason of said payment any lien that said bank may claim" under the above-mentioned provision of its charter " has become discharged, and by reason thereof petitioner is entitled to have a transfer of the stock held by it," and accordingly " prays that a decree may be rendered requiring defendant bank and its proper officers to accept the surrender of said fifteen shares of stock, and in lieu thereof issue to petitioner new stock for the same amount and of the same face value."

The Peoples Bank filed an answer in which it admitted that its

capital stock was $29,000, and that under its charter "the total liabilities of any person to said bank 'for money borrowed' can not exceed one tenth of the capital stock;" but it therein alleged that its charter also provided that "the discount of bills of exchange drawn in good faith and the discount of commercial paper actually owned by the person discounting the same shall not be considered as borrowed money," and that while Estes became largely indebted to the bank, his indebtedness to it "for 'money borrowed' at no time, from date he became indebted to plaintiff to maturity of the claim of plaintiff, exceeded, nor did it reach, $2,900.00, and that his large indebtedness arose by reason of the defendant discounting in good faith commercial paper actually owned by Estes." The Peoples Bank also in its answer admitted the demand made upon it by the plaintiff to transfer to it the fifteen shares of stock in controversy, but pleaded as a justification for refusing to comply with this demand the following matters of defense: Estes was indebted to the defendant bank "at the time plaintiff claims that the 15 shares of stock" were deposited with it; "also at the time plaintiff demanded a transfer of said stock, and is now indebted." Section 6 of the charter of the Peoples Bank of Talbotton provides: "That the board of directors shall issue to each stockholder certificates of stock which shall be held bound to the bank for any dues or other indebtedness by said stockholder to the bank, and a lien is hereby declared upon the same in favor of the bank, superior to all others, which may be foreclosed upon the same as a mortgage upon personal property, and sold in the same way, and no stockholder who may be indebted to said bank, either as principal or security or indorser, shall, while so indebted, sell or transfer the stock held by him or her without the consent of the president and directors of the bank, and all sales and transfers of stock in said bank must, in order to be valid, be made on the books of the bank by the owner of the stock, or his or her lawfully appointed attorney in fact, under such rules and regulations as may be declared by the by-laws of the bank, and any other transfer is void as against the company." This provision being contained in a charter which constituted "a part of the public law," and the world being therefore charged with notice thereof, "the plaintiff could not have been 'an innocent purchaser for value without notice of the conditions in defendant's charter.'" The amount of Estes' indebtedness to it "at the time

plaintiff demanded transfer of stock was, and now is, sufficient to cover the value of said 15 shares of stock," and accordingly "the plaintiff is not entitled to a transfer of the same;" for, under the charter provision above quoted, the assignment to plaintiff "of said stock while the stockholder, G. H. Estes, was indebted to" the defendant "bank was absolutely void."

By way of amendment to its petition, the Exchange Bank replied to this answer by alleging, among other things, the following: The Peoples Bank "violated its charter in loaning to said G. H. Estes a larger sum than ten per cent. of its capital stock," permitted him to make large overdrafts, "accepted bills of exchange not drawn in good faith" by him, and discounted commercial paper which was not actually owned by him. A large amount of usurious interest is included in the indebtedness of Estes to that bank, and "upon a just accounting of all money loaned by said defendant to said Estes at the legal rate of interest, the payments and credits made by and allowed to said G. H. Estes for money and property received by it would fully pay off and discharge the principal debt and all legal interest thereon." In this amendment the Exchange Bank prayed that "a just and true accounting be had and taken between said G. H. Estes and said defendant, and an examination into said pretended indebtedness of said Estes and said defendant be made, and that the usurious interest charged or taken be deducted and purged therefrom, and that the true and legal principal and interest be ascertained and the credits made by said Estes be applied thereto and the true balance, if any, be found." Upon motion of the plaintiff's counsel, the case was referred to an auditor, who rendered a finding in favor of the defendant bank. To his report the plaintiff filed numerous exceptions of both law and fact, which were sustained by the judge of the superior court, who by consent heard and disposed of the case without the intervention of a jury, and who entered up a judgment in favor of the plaintiff. To this judgment the Peoples Bank duly excepted and brought the case to this court for review.

1. The Peoples Bank of Talbotton was incorporated by an act of the General Assembly approved December 3, 1890. See Acts of 1890–91, vol. 2, pp. 42–46. Section 4 of that act declares that "the total liabilities to said bank of any person, or of any company, corporation or firm, for money borrowed . . shall at no time ex-

ceed one-tenth part of the capital stock of said bank paid in, but the discount of bills of exchange drawn in good faith, and the discount of commercial paper actually owned by the person negotiating the same, shall not be considered borrowed money." Section 6, the substance of which was set forth in the defendant's answer, contains a provision to the effect that the stock issued to each stockholder " shall be held bound to the bank for any dues or other indebtedness by said stockholder to the bank;" that it shall have a lien thereon " superior to all other liens, which may be foreclosed upon the same as a mortgage upon personal property, . . and no stockholder who may be indebted to said bank, either as principal or security or indorser, shall, while so indebted, sell or transfer the stock held by him or her without the consent of the president and directors of the bank, and all sales and transfers of stock in said bank must, in order to be valid, be made on the books of the bank by the owner of the stock, or his or her lawfully appointed attorney in fact, under such rules and regulations as may be declared by the by-laws of the bank, and any other transfer is void as against " the bank. As its capital stock was $29,000, and as its charter in terms declared that it should not permit any person at any time to become indebted to it " for money borrowed " in an amount exceeding one tenth of its paid-up capital stock, the conclusion seems irresistible that it was not in legislative contemplation that the bank should have a lien for more than $2,900 with respect to any indebtedness arising from loans made to any one person. It is equally true, we think, that it was not the legislative intent that the bank should forfeit its lien in the event it violated that provision of its charter just referred to. On the contrary, that provision was evidently intended to operate for the benefit and protection of the stockholders of the bank, and not to shield from liability one who borrowed from the bank an amount in excess of that which its officers were authorized to lend to him, or to confer upon third persons the right to assert that the bank had forfeited its lien by reason of the fact that it had violated its charter in this respect. This interpretation of the legislative will is in accord with that placed upon similar enactments by the Supreme Court of the United States and other courts of this country. See, in this connection, Gold-Mining Co. v. National Bank, 96 U. S. 640 ; National Bank v. Matthews, 98 U. S. 621; O'Hare v. National Bank, 77 Pa. 96; Corco-

ran *v.* Batchelder, 147 Mass. 541; Smith *v.* National Bank, 45 Neb. 444; Ferguson *v.* Oxford Mercantile Co. (Miss.), 27 So. Rep. 877; 16 Am. & Eng. Enc. L. 166; 2 Mor. Corp. §§ 666, 672–3.

It appears from the record before us that on January 10, 1896, the date upon which Estes made a transfer of his stock to the Exchange Bank, he owed the Peoples Bank, for money borrowed prior to that time, $2,996.   While this amount was in excess of that which, under the charter of that bank, its officers were authorized to loan him, we nevertheless hold, for the reasons above stated, that the Peoples Bank could successfully assert, as against the Exchange Bank, had it on January 10 demanded a transfer of the stock on the books of the defendant bank, that it had a valid lien thereon to the amount of $2,900.   On the argument of the case before this court, counsel for the defendant in error abandoned their contention that the Exchange Bank occupied the position of an innocent purchaser of the stock without notice, saying in a brief filed in its behalf :   " We concede that the Exchange Bank must be held to have had actual notice of the provisions of the charter of the Peoples Bank, and that when on January 10th, 1896, it loaned Estes the $1,-600.00 on his stock, it was put on inquiry as to his existing indebtedness to the Peoples Bank, and is bound by the knowledge of all that inquiry would have disclosed."   Counsel further stated:   " We frankly concede.that, as between Estes and the Peoples Bank, Estes could not set up, as a defense to the bank's claim, that his indebtedness was illegally contracted and its loan to him ultra vires and void ; for Estes would be bound to pay back even though he had borrowed the entire capital of the bank, and so all the courts have decided."

2. So we will pass to a consideration of the contention urged before us by counsel for the defendant in error, that it had a right to assume, granting that it knew or ought to have known the amount of Estes' indebtedness to the Peoples Bank on January 10, that this bank would not thereafter violate its charter by allowing him to further increase his liabilities to it for money borrowed, and that therefore the Exchange Bank " could safely lend him $1,600.00 on his fifteen shares of stock."   From a purely business standpoint, this proposition would seem to be far from sound.   The face value of these fifteen shares of stock was only $100 per share, and there is nothing in the record to indicate that on the day last mentioned

their market value exceeded, or was even equal to, the face value of the same. On that date the Peoples Bank had a valid lien thereon to the amount of $2,900 for borrowed money, to discharge which would impose upon the Exchange Bank the necessity of its paying to the Peoples Bank precisely twenty-nine hundred dollars. In the event Estes failed to pay his then existing indebtedness of $2,996 to the latter bank, and it foreclosed its lien on the stock and brought it to sale, the Exchange Bank could not reasonably hope to receive any portion of the proceeds of the sale, unless the stock brought something more than $1,400 in excess of its face value, which was quite improbable. In other words, the Exchange Bank, on January 10, had practically no security at all for its loan to Estes of $1,-600, and could hardly be placed in any worse situation by future dealings between Estes and the Peoples Bank whereby his indebtedness to it for borrowed money was increased.

The proposition upon which counsel for the defendant in error insist is equally unsound from a legal standpoint. They admit that their client " made no formal demand on the Peoples Bank for a transfer on its books of the fifteen shares of stock until just prior to filing its suit in September, 1898," more than two years after it procured from Estes an assignment of this stock. The evidence introduced upon the hearing before the auditor showed conclusively that none of the officers of the Peoples Bank (save Estes himself, its president) had any knowledge of this assignment, or of the fact that the Exchange Bank claimed to have any interest in the shares of stock issued to him, until November 20, 1896. On that day his indebtedness to the Peoples Bank on notes held by it amounted to nearly $9,000, and to secure the payment of the same he gave to that bank a mortgage on his stock of merchandise, and trans-ferred to it all of his notes and accounts. Then, for the first time, did the other officers of the bank become informed that the Exchange Bank held an assignment by him of his fifteen shares of stock. This assignment did not operate to pass to it the legal title to the stock, which could be acquired only in the way pointed out in the charter of the Peoples Bank, viz., by a formal transfer of the stock upon its books. Hammond v. Hastings, 134 U. S. 401; 1 Cook, Stock & Stockholders, § 412 et seq. Nor was it the right of the Exchange Bank to demand that such a transfer should be made, unless it offered to discharge the lien upon the stock held by the

Peoples Bank. Union Bank *v.* Laird, 2 Wheat. 390 ; Reese *v.* Bank of Commerce, 14 Md. 271, 74 Am. Dec. 536. And having acquired no more than an equitable interest in the stock, and having neglected to take any steps to protect itself by giving notice of its equitable title thereto, the Exchange Bank is not in a position to complain that, between the 10th of January and the 20th of November, 1896, the Peoples Bank extended further credit to Estes.   On the contrary, it was clearly the right of the Peoples Bank, up to the time it received notice of the equity of the Exchange Bank, to treat Estes as the rightful and legal owner of the stock, and to deal with him accordingly.   See 1 Cook on Stock & Stockholders, § 425 ; 23 Am. & Eng. Enc. L. 694, and cases cited in note 4; Civil Code, § 3077; *Guerry* v. *Perryman,* 6 *Ga.* 119.   After receiving such notice, however, it was the duty of the Peoples Bank to respect the rights of the Exchange Bank by regarding it as the true owner of the stock, notwithstanding no formal transfer of it had been made on the books of the former.   *Guarantee Co.* v. *East Rome Town Co.,* 96 *Ga.* 511.   Accordingly, after notice brought home to it in any way, the Peoples Bank could no longer extend credit to Estes upon the faith of his ownership of the stock and rely for protection upon the lien for which its charter provides, so far as any new and additional loan to him was concerned.   Birmingham Co. *v.* Louisiana National Bank (Ala.), 20 L. R. A. 600.

3. The principles of law above announced control the case at bar.   Before undertaking to apply them to the facts disclosed by the record, it is necessary, however, to dispose of still another point relied on by counsel for the prevailing party below.   It was insisted that as Estes was the president of the Peoples Bank at the time he assigned his stock, it was chargeable with notice of the fact that he had made a pledge of this stock to the Exchange Bank; and the following cases were cited in support of this contention: *Brobston* v. *Penniman,* 97 *Ga.* 527; *Morris* v. *Georgia Loan Co.,* 109 *Ga.* 12; *Fouché* v. *Merchants National Bank,* 110 *Ga.* 827; *Singleton* v. *Bank of Monticello,* 113 *Ga.* 528.   The decision in each of these cases was based upon the proposition that a corporation which seeks to enforce for its benefit a contract made in its behalf by one of its officers is in law chargeable with notice of whatever he knew at the time the contract was entered into.   None of these cases, therefore, have any bearing upon the case in hand.

The Peoples Bank is certainly not trying to enforce against the Exchange Bank any contract with it which Estes, acting as president of his bank, made in its behalf or for its benefit. The Exchange Bank dealt with Estes in his individual capacity, as a seller of merchandise and trader in cotton, who desired to borrow for his own personal use $1,600, and who offered to pledge as security for the loan certain shares of stock of which he, as an individual, was the holder in his own right. With President Estes, the ranking officer of the Peoples Bank, the Exchange Bank had no dealings whatsoever. This being so, the knowledge which Estes had concerning his transactions with the latter bank can not be said to have been acquired by him while acting in his official capacity as president of the other bank. Nor can it be seriously insisted that the Peoples Bank was chargeable with notice of what Estes knew when he, after assigning his stock, induced it to extend to him further credit. In all his subsequent transactions with the bank he acted merely as an individual who had urgent need of moneys and dealt at arm's length with its other officers, who, as its duly authorized representatives, made to him additional loans in ignorance of the fact that he had parted with his stock. Accordingly, his knowledge of what he had, acting in his individual capacity, previously done with his stock was not imputable to that bank, notwithstanding he was its president. *Merchants National Bank* v. *Demere*, 92 *Ga.* 735; *English-American Loan Co.* v. *Hiers*, 112 *Ga.* 823. To hold otherwise would be to give to the doctrine of constructive notice an application wholly unwarranted; for that doctrine rests upon purely equitable principles, and can not be invoked except in extreme cases where justice demands its recognition. The case in hand does not belong to that class of cases just referred to, since it was entirely owing to the inexcusable neglect on the part of the Exchange Bank to give notice to all concerned of its equities that the Peoples Bank did not, prior to November 20, 1896, become aware thereof.

4. It was the privilege of the Exchange Bank, on the day last mentioned, or at any other time it might have seen fit, to assert, as against the Peoples Bank, that it did not have a valid lien for more than $2,900 on the stock issued by it to Estes, and accordingly was bound to release the stock upon payment of that amount by his assignee. But the Exchange Bank seems unwilling to pay

anything at all in order to remove this lien of $2,900 which existed at the time it acquired the stock from Estes and continued up to November 20, 1896. Indeed, its petition was framed upon the only theory upon which it could logically rely as a basis for requiring the Peoples Bank to make a transfer of the stock in the absence of an offer on the part of the former to discharge whatever lien the latter might have thereon, viz.: that payments by Estes upon his indebtedness to the Peoples Bank inured to the benefit of his assignee, and so soon as he discharged in full such indebtedness, the lien on his stock could no longer attach thereto, and the Exchange Bank, as the equitable owner of the stock, would be entitled to demand a transfer of the same upon the books of the defendant bank. That is to say, the Exchange Bank occupies a situation similar to that of a person purchasing property which is subject to the lien of a mortgage, who, if he does not himself wish to discharge such lien, can not claim to have an unincumbered title to the property until such time as the mortgagor shall have satisfied in full his indebtedness to the mortgagee. Had the Exchange Bank, on January 10, given notice that it was the equitable owner of the stock, the sum of $2,996, which Estes then owed to the Peoples Bank, would represent the amount of indebtedness he would be called upon to discharge before the Exchange Bank could justly claim to be entitled to a transfer of the stock to it on the books of the bank issuing the same. But, as has been remarked, that bank did not acquire notice until November 20, when Estes' indebtedness to it had reached nearly $12,000, consisting of an overdraft of $1,879; a note for $1,000, signed by Charles E. Estes and indorsed by G. H. Estes, secured by a pledge of ten shares of bank stock; and certain other notes, upon which G. H. Estes was liable either as principal or indorser, calling for the payment of $8,768.40. These three items, then, represent the amount of indebtedness which it was incumbent upon the Exchange Bank to show had been fully paid off by Estes; and it was, of course, the right of that bank to demand that the Peoples Bank should allow him proper credits for all sums which it received from him. The evidence discloses that the Charles E. Estes note was satisfied in full by the holder accepting in payment thereof the ten shares of bank stock pledged as collateral security. On the argument here it was insisted that this note was held simply as security for the

payment of the other notes above referred to; but this contention is not sustained by the testimony as it appears in the record before us.    The evidence further discloses that the overdraft of $1,879 was, on November 20, settled by Estes conveying to the Peoples Bank a storehouse and lot in Talbotton.    So the real controversy presented for determination by the auditor was:  Had the Peoples Bank realized from the choses in action turned over to it by Estes and the stock of goods covered by his mortgage to it an amount sufficient to satisfy the third item of $8,768.40, represented by ten promissory notes upon which Estes was liable?   It was shown that three of these notes, aggregating in amount $699, had been paid; that the proceeds of a sale under the mortgage of the stock of goods were $3,886.75; that the net proceeds of certain choses in action turned over to attorneys for collection amounted to $1,396.30, and that Estes, who had undertaken to collect on commission other notes and accounts which had been assigned to the bank, paid over to it $706.16.   Deducting the amount thus realized by the Peoples Bank, viz., $6,688.21, from the item of $8,768.40, above referred to, there would still remain an unpaid balance of over two thousand dollars on the indebtedness which Estes had contracted prior to November 20.

It appeared on the hearing before the auditor that Estes was also indebted to the bank in the sum of $1,601.73 on an overdraft which, the plaintiff below contended, he had been allowed to make after the Peoples Bank received notice of the equities claimed by the Exchange Bank.    The auditor was of the opinion that the plaintiff's contention was not sufficiently supported by proof; yet as his honor of the court below evidently entertained a different view, it may, for the purposes of this discussion, be granted that this charge against Estes of $1,601.73 should not be considered as forming a portion of the indebtedness contracted by him before the date last mentioned.    We would not, indeed, deem it necessary to refer at all to this item of indebtedness, were it not for the fact that it appeared on the hearing that the Peoples Bank became the purchaser at the mortgage sale of Estes' stock of goods, subsequently disposed of them at a profit of $747.38, and credited him with that amount on his general account, which, of course, included the charge of $1,601.73 against him.    Counsel for the defendant in error assumed, on the argument here, that this credit of $747.38

should be applied to the extinguishment of the indebtedness which arose prior to November 20, rather than to that which was thereafter contracted. We think otherwise. The mortgage on the stock of goods having been duly foreclosed, and the Peoples Bank having become the purchaser at the sale had thereunder, it was the absolute owner of the goods, and was certainly under no legal duty, either to Estes or his creditors, to give him the benefit of any profit it might make upon a resale of the goods. The credit which the bank did, of its own motion, allow him on his general account with it was in the nature of a gift, purely personal in character. It was doubtless influenced by a spirit of commendable fairness and liberality towards Estes, which should not be discouraged but applauded. We therefore hold that, as this credit had not been applied to any particular item of indebtedness, the Exchange Bank had no right to demand that it should be appropriated to the payment of a debt which was covered by the lien by which that bank was embarrassed.

When, on November 20, Estes executed this mortgage and turned over to the Peoples Bank all of his choses in action as security for the payment of notes to the amount of $8,768.40, which it held against him, he did so upon the express understanding that two of these notes should first be satisfied out of the proceeds realized from the securities thus given to the bank. These two notes were signed by Estes and one Wilkerson, ostensibly as joint makers, though Wilkerson's true relation to the notes was that of an accommodation indorser, which fact was known to the bank when it received them. Counsel for the defendant in error insisted here that the Peoples Bank had no right, as against the Exchange Bank, to comply with its obligation to Estes to apply to the payment of these notes the proceeds first arising from the assets he had turned over to it as security for the payment of these and other notes. The point is not well taken. Estes had a right, when he voluntarily turned over his assets to the Peoples Bank, to direct it how to apply the proceeds thereof, and it was bound to keep faith with him, or else be placed in the awkward situation of releasing Wilkerson from liability on the notes by declining payment of them by Estes, the only real principal thereon. The Exchange Bank would accordingly gain no benefit from a violation by the Peoples Bank of its agreement with Estes; and moreover, it is not the pol-

icy of a court exercising equity jurisdiction to countenance a suggestion by a party that, in order to protect him, it was the duty of another to disregard a solemn contract which he was in good conscience bound to respect.

It was developed on the hearing before the auditor that the Peoples Bank still hoped to realize from the choses in action turned over to it by Estes between five and six hundred dollars. But this is a matter of no significance, so far as the present case is concerned; for, as has been seen, the plaintiff based its right to the relief sought solely on the ground that Estes had fully discharged all of his indebtedness to the Peoples Bank as to which it could assert a lien on his stock. As this seems not to have been true in point of fact, the plaintiff was not entitled to an immediate transfer of the stock, and therefore its action was prematurely brought. It is to be noted that the plaintiff's petition contained no offer on its part to pay such indebtedness to the Peoples Bank as might not have been discharged by the payments made by Estes, in the event the court might decree that bank had a right to assert its lien in regard thereto; so the auditor was not called upon to determine precisely what amount it was necessary for the Exchange Bank to pay to the Peoples Bank in order to free the stock from its lien. In support of his conclusion that the Exchange Bank had failed to show that the defendant bank had been paid in full, he submitted a calculation as to how accounts stood between Estes and that bank. It is really immaterial whether this calculation was or was not in all respects accurate, or based upon correct findings as to the items of account which should be taken into consideration, since, as we have shown above, the unpaid balance of Estes' indebtedness to the Peoples Bank which had been contracted before it received notice of the equities of the Exchange Bank amounted to at least $2,000 principal, exclusive of interest and other items which the defendant bank claimed should be taken into account. Possibly the time may come when the Exchange Bank will be entitled to a transfer of the stock which is the subject-matter of the present controversy, without paying anything to the Peoples Bank in order to discharge its lien. Or, it may be, the Exchange Bank will be desirous hereafter of acquiring the legal title to the stock, even though to do so will involve the expenditure by it of some money. If so, it can institute another proceeding with a view to securing a de-

cree fixing the precise amount it will have to pay in order to obtain the desired transfer of the stock, — provided, of course, the same is not brought to sale by the Peoples Bank under its lien, to the end that the proceeds thereof may be applied to that portion of the indebtedness, contracted by Estes prior to November 20, which still remains unpaid.

*Judgment reversed. All the Justices concurring, except Lumpkin, P. J., absent, and Candler, J., not presiding.*